Lisa R. Petersen (7598)
Amy L. Herrington (18695)
COHNE KINGHORN, P.C.
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
Email: lpetersen@ck.law
         aherrington@ck.law

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, SOUTHERN REGION

---

| | |
|---|---|
| REBECCA BROADBENT, JARED RASBAND, AND HAZEL SAINSBURY, <br><br> *Plaintiffs,* <br><br> v. <br><br> RICHARD "BIFF" WILLIAMS, JORDON SHARP, DEL BEATTY, MICHAEL LACOURSE, HENRIE WALTON, TIFFANY WILSON, UTAH TECH UNIVERSITY, GEOFF LANDWARD, UTAH BOARD OF HIGHER EDUCATION, UTAH SYSTEM OF HIGHER EDUCATION, THE OFFICE OF THE COMMISSIONER OF HIGHER EDUCATION, ALISON ADAMS, ERIC PEDERSEN, MATT BLACK, JYL HALL, JARED MADSEN, STACY SCHMIDT, BROOKE ULRICH, TRAVIS ROSENBERG, and COURTNEY WHITE. <br><br> JOHN AND JANE DOES I-X <br><br> *Defendants*. | **COMPLAINT** <br><br> Civil No. 4:24-cv-00091-DN <br><br> Judge: David Nuffer <br><br> **JURY DEMAND** |

Plaintiffs Rebecca Broadbent, Hazel Sainsbury, and Jared Rasband (collectively, "Plaintiffs"), by and through counsel, hereby complain and allege against Defendants Richard "Biff" Williams, Jordon Sharp, Del Beatty, Michael Lacourse, Henrie Walton, Tiffany Wilson, Utah Tech University ("Utah Tech" or the "University"), Geoff Landward, Utah Board of Higher Education, Utah System of Higher Education, the Office of the Commissioner of Higher Education, Alison Adams, Eric Pedersen, Matt Black, Jyl Hall, Jared Madsen, Stacy Schmidt, Brooke Ulrich, Travis Rosenberg, and Courtney White (collectively, "Defendants") as follows:

## NATURE OF THE CASE

1.    This case centers on a public university, Utah Tech University, that has continuously and openly flouted the protections of Title IX. Plaintiffs, in their respective capacities within Utah Tech's offices of general counsel and Title IX, worked hard to establish an environment free from harassment and discrimination. Yet in doing so, they faced resistance, intimidation, harassment, and retaliation from Utah Tech's highest leaders. This pushback culminated in a sexual and obscene visual display presented at the home of a University vice president and attributed to the Plaintiffs by then-President of Utah Tech, "Biff" Williams. Worse, Utah Tech followed this obscenity with a sham investigation, cover up, and derogation of Plaintiffs' grievances, while the institution's governing bodies, the Utah System of Higher Education, the Utah Board of Higher Education, and the Office of the Commissioner of Higher Education, oversaw the sham investigation and coverup and displayed indifference to Plaintiffs' grievances. Still worse, Plaintiffs have lost all support in their roles as Title IX and equity compliance officials, advisors, and supervisors at Utah Tech, leaving one of Utah's largest learning institutions devoid of Congress' civil rights protections. Because of Defendants' abhorrent conduct, Plaintiffs now seek every remedy available to them for these wrongs.

2

## PARTIES

2.      Broadbent is a female individual, who resides in St. George, Utah. She has been employed by Utah Tech as General Counsel since January of 2020. In this role, she manages and leads the Office of General Counsel ("OGC"), with additional supervisory oversight over the Office of Equity and Compliance & Title IX ("OEC & TIX") which Plaintiff Sainsbury leads and manages. Broadbent is Utah Tech's most senior female administrator and one of only two females on the President's Cabinet.

3.      Rasband is an individual, who resides in St. George, Utah. He has been employed by Utah Tech since April 2020 and is presently its Senior Associate General Counsel. In his role, Rasband is the OGC attorney primarily responsible for advising the OEC and TIX.

4.      Sainsbury is a female individual of African descent who resides in St. George, Utah. She has been employed by Utah Tech since August 2020 as its Director of Equity Compliance and Title IX Coordinator, leading and managing the OEC & TIX in her role.

5.      Utah Tech is a public, degree-granting university of higher education within USHE, located in St. George, Utah.

6.      Utah Tech is overseen by the Utah System of Higher Education ("USHE"), a Utah governmental agency.

7.      USHE is governed by the Utah Board of Higher Education ("UBHE") and the Office of the Commissioner of Higher Education ("OCHE").

8.      The president of Utah Tech is appointed by, and reports to, the UBHE, but is an employee of Utah Tech and is subject to Utah Tech policies and procedures.

3

9.    Geoff Landward is the Commissioner for USHE, UBHE, and OCHE, having previously served as their Deputy Commissioner and General Counsel. Landward is a resident of Utah.

10.    Richard "Biff" Williams was the president of Utah Tech from 2014 to January 5, 2024. Until June 2024, Williams was a Utah resident. On information and belief, Williams is now a resident of Missouri.

11.    Jordon Sharp is the Vice President of Marketing and Communications at Utah Tech, and on information and belief, has been employed by Utah Tech since 2012. Sharp is a resident of Utah.

12.    Del Beatty is the Vice President of Student Affairs at Utah Tech, and on information and belief, has been employed by Utah Tech since 2008. Beatty is a resident of Utah.

13.    Henrie Walton is Assistant to the President for Government and Community Relations/Interim Chief of Staff at Utah Tech and, on information and belief, has been employed by Utah Tech for the last nine years. Walton is a resident of Utah.

14.    Michael Lacourse is Provost and Vice President of Academic Affairs and, on information and belief, has been employed by Utah Tech since at least 2016. Lacourse is a resident of Utah.

15.    Courtney White is Interim President at Utah Tech, previously Chief of Staff, and, on information and belief, has been employed by Utah Tech since at least 2015. White is a resident of Utah.

4

16.   Alison Adams is the General Counsel for the UBHE, USHE, and OCHE, and she has been employed by USHE, and/or the UBHE and/or OCHE since approximately 2021. Adams is a resident of Utah.

17.   Travis Rosenberg is Executive Director of Human Resources at Utah Tech and, on information and belief, has been employed by Utah Tech since at least 2016. Rosenberg is a resident of Utah.

18.   Tiffany Wilson is the Chair of the Board of Trustees at Utah Tech. Wilson is a resident of Utah.

19.   Jyl Hall is Director of Public Relations at Utah Tech and, on information and belief, has been employed by Utah Tech since at least 2014. Hall is a resident of Utah.

20.   Jared Madsen is Director of University Design and Branding at Utah Tech and, on information and belief, has been employed by Utah Tech since at least 2014. Madsen is a resident of Utah.

21.   Brooke Ulrich is Director of University Events and Promotions and, on information and belief, has been employed by Utah Tech since 2021. Ulrich is a resident of Utah.

22.   Stacy Schmidt is Assistant Director of Public Relations at Utah Tech and, on information and belief, has been employed by Utah Tech since at least 2019. Schmidt is a resident of Utah.

23.   Matt Black is Photographer and Videographer at Utah Tech and, on information and belief, has been employed by Utah Tech since at least 2019. Black is a resident of Utah.

24.   Eric Pedersen is a Professor of Software Engineering at Utah Tech, previously a dean, and, on information and belief, has been employed by Utah Tech since at least 2014. Pedersen is a resident of Utah.

5

25.   JOHN AND JANE DOES 1-X are defendant individuals and/or entities whose true names are unknown, but who were involved in the conduct described herein and are liable for the claims for relief detailed herein.

## JURISDICTION AND VENUE

26.   This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, under Title IX, 20 U.S.C. § 1681 *et seq*.; 34 C.F.R. § 106.71; 42 U.S.C. § 2000e, *et seq*.

27.   The Court has supplemental jurisdiction over Plaintiffs' defamation, false light, breach of contract, intentional and negligent infliction of emotional distress, and tortious interference with contract claims pursuant to 28 U.S.C. § 1367, because the facts giving rise to these claims form part of the same case or controversy as Plaintiffs' discrimination and retaliation claims under Title IX and Title VII.

28.   The Court has personal jurisdiction over Defendants because Defendants reside in Utah, are incorporated in Utah, or their contacts with Utah gave rise to Plaintiffs' claims.

29.   Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction here.

30.   Plaintiffs have taken steps to exhaust their administrative remedies before filing this suit. Specifically, Plaintiffs Broadbent and Sainsbury received their Right to Sue letters from the EEOC on November 6, 2024.

31.   Plaintiffs have complied with the requirements of the Governmental Immunity Act, Utah Code § 63G-7-101 *et seq*. Plaintiffs submitted a Notice of Claim on August 30, 2024, to all relevant Defendants in this action and followed all necessary procedural steps required by statute.

**GENERAL ALLEGATIONS**

32.   For the last several years, Utah Tech has exhibited a culture of hostility in its highest administrative offices toward the protections of Title IX and Title VII.

33.   Plaintiffs worked hard to establish a discrimination-free environment at Utah Tech. Yet, Plaintiffs received strong pushback, intimidation, discrimination, harassment, abuse, and retaliation in their ongoing attempts to educate Utah Tech leadership about, and to achieve compliance with, University policies regarding discrimination and harassment, including Title IX and Title VII.

34.   For example, one such situation involved then-President Williams' close friend and direct report, VP Sharp, and members of Sharp's University Marketing and Communications team ("UMAC") allowing, for over four years, the posting and display in a public break room on campus of highly obscene and vulgar sexual comments with their names attributed to the comments. Attached hereto under seal as Exhibits "A" and "B" are copies of the offensive information that was the subject of this situation. As a result of this situation and Plaintiffs' legally-mandated response to it in September 2021, Sharp and his UMAC team's gross misconduct was minimized by Human Resources and Williams; Plaintiffs were required to continue working directly with Sharp and his UMAC team; and Plaintiffs were viewed unfavorably by Sharp, other senior administrators, and the UMAC department, for simply fulfilling their job responsibilities. This situation is hereinafter referred to as the "September 2021 Incident."

35.   The September 2021 Incident, as well as other instances involving senior University administrators being involved in matters processed by the OEC & TIX, resulted in

Utah Tech's senior leaders questioning the OEC & TIX's processes, Plaintiffs' authority under those processes, and Plaintiffs' professionalism and motives. Thus, a "poisoned well" and hostile work environment were created for Plaintiffs.

**Defendants Continue to Harass, Discriminate, and Retaliate Against Plaintiffs**

36.   Utah Tech sought to benefit from Sainsbury's background and experience in the OEC & TIX, particularly regarding the visibility Sainsbury's race. In April 2022, the University specifically reached out to Sainsbury to participate in a video for the rebranding of the institution from Dixie State University to Utah Tech University. This video, which included the unveiling of the new name and logo, prominently featured Sainsbury's likeness and was distributed both nationally and internationally. Sainsbury was the central figure in this video, with her voice serving as the closing element. This strategic positioning was directly tied to Sainsbury's race, as the University seemed to believe that her identity would lend greater credibility to the rebranding, especially in the eyes of diverse communities.

37.   The University leveraged Sainsbury's race to enhance its image in key public-facing situations. This included her role in meeting athletes and their families, representing the University at freshman orientations, and positioning her as a resource for students facing issues of discrimination. However, this use of Sainsbury's background was more tokenistic than sincere. The University seemed more concerned with the symbolic value of Sainsbury's presence rather than empowering her to fulfill her legally mandated responsibilities as outlined by Title IX.

38.   Sainsbury's experiences with certain University leadership figures, particularly Lacourse, reflect a pattern of marginalization. At Williams' request, Plaintiff Broadbent asked Plaintiffs Rasband and Sainsbury o provide Lacourse with a "heads up" concerning a course of

8

action determined for a Title VII matter being processed by the OEC and TIX. During that meeting, Lacourse openly disrespected Sainsbury, questioning her right to offer input on Title IX matters. During this meeting, Lacourse pointed a finger at Sainsbury and aggressively slammed his fist on the table, demanding to know "who do you think you are!" His behavior was deeply unsettling and discriminatory in nature, as he targeted Sainsbury with verbal threats. The intensity and nature of Lacourse's actions, which included physical intimidation and refusal to listen to Rasband's attempts to mediate, left Sainsbury feeling emotionally and physically unsafe.

39.   Plaintiff Rasband was also present for this meeting with Lacourse and was also subjected to his verbal abuse and harassment. Because both Plaintiffs Sainsbury and Rasband are Plaintiff Broadbent's direct reports, Plaintiff Sainsbury complained to Plaintiff Broadbent (who was out of town at the time at a conference) that Plaintiff Sainsbury felt she had no power to stand up to Lacourse as the University's Provost, or to champion the University's policies as prescribed by federal regulations and her job responsibilities as Director of the OEC & TIX.

40.   When Plaintiff Broadbent learned of the further undermining, abuse, harassment, and attacking of her direct report, Plaintiff Sainsbury, and to a lesser degree, her direct report Rasband, and the OEC & TIX which Plaintiff Sainsbury manages and directs, and for which Plaintiff Broadbent was responsible for overseeing in order to maintain the University's federal financial aid funding, Plaintiff Broadbent experienced additional physical and emotional distress and further exacerbation of the existing hostile work environment.

41.   Even without the pre-existing incidents which had created a hostile work environment for Plaintiffs, Lacourse's behavior alone in the June 23, 2022, meeting created a hostile work environment for Plaintiffs, and none of them have felt safe or comfortable in Lacourse's presence or in communications with him since that time. Lacourse's misconduct was

9

so harassing, discriminatory, and abusive that Plaintiffs Rasband and Sainsbury were rendered unable to perform their work responsibilities for time thereafter and the course of action for the Title VII matter was delayed due to Plaintiff Sainsbury's inability to proceed in the wake of such harassment and discrimination.

42.   After this meeting, Lacourse followed up with an email to Defendant Williams, in which Lacourse likened Plaintiff Sainsbury unfavorably to a former attorney of color who had previously been considered "problematic" by certain University officials. This email contained racially charged language and revealed a clear bias against Plaintiff Sainsbury—calling her "reckless," "irresponsible," "unpredictable," and "malicious." These statements reflect racial animus, as if Lacourse and the University felt that a Black, educated female in a position of authority could not be trusted or was inherently suspicious.

43.   Lacourse's actions and inactions, both before and after the June 23, 2022 meeting with Plaintiffs Rasband and Sainsbury, in which Lacourse undermined Plaintiffs' abilities to ensure the University and its employees and students are compliant with the nondiscrimination and harassment laws and policies which apply to the University and its employees and students, contributed to the "poisoned well" and indirectly contributed to Plaintiffs being retaliated against and/or being the recipients of unwelcome conduct by Williams when he targeted them by falsely signing their names to the sexual display of vegetables in the shape of male genitalia which he delivered to Sharp on November 8, 2023.

44.   The University also failed to take appropriate action when Sainsbury was subjected to mockery and ridicule by certain Deans, including an inappropriate "Title IX mocking party" that celebrated a former respondent and disparaged Sainsbury's work. The event included "gag gifts," with a "Title IX for Dummies" book, and was intended to belittle the

serious work of the OEC & TIX. This behavior was never addressed by the University, and no disciplinary action was taken against those who participated in this hostile and discriminatory activity.

45.    Additionally, the University failed to protect Sainsbury when former Title IX respondent and dean, Kyle Wells, who was dissatisfied with the outcome of his case, began petitioning the Utah Attorney General's office for recourse against Sainsbury. Although Wells never formally appealed the actions or findings in his case, the University allowed him to attempt to undermine Sainsbury's professional standing by seeking adverse action against her. The University also failed to provide her with adequate support or protection, including addressing Wells' actions, which seemed retaliatory in nature. They did not prevent Wells from defaming Sainsbury both internally within the University and externally, and she was not informed of or supported through these ongoing attempts to undermine her credibility and role as a Title IX Coordinator.

46.    Defendants also resisted Plaintiffs' efforts to train Utah Tech's leaders on Title VII and Title IX compliance. For example, after a training session in November 2022 to try and correct the "poisoned well," Lacourse stated at a Cabinet meeting that the OEC & TIX's policies were being "weaponized." Utah Tech's highest leaders continuously and openly undermined the OEC & TIX's and OGC's efforts to administer and ensure the protections of Title IX and Equity Compliance for students and employees at Utah Tech.

47.    Another example of Plaintiffs' ongoing hostile work environment occurred in August 2023, when Lacourse and Pedersen harassed and verbally abused Plaintiff Rasband in a meeting which Plaintiff Broadbent requested that Rasband arrange with them, to ensure that a

11

Title IX complainant in a recently-resolved matter would not be subjected to any retaliation by University officials.

### Defendants Target Plaintiffs with Sexual Obscenity

48.   Utah Tech's pattern of hostile and brazen misconduct, discrimination, harassment, and retaliation by the senior male administrators culminated in a crude, sexual, vulgar, obscene, and damaging display left on the porch of a Utah Tech administrator by the then-sitting University President Williams, and falsely attributed by him to the Plaintiffs.

49.   On November 8, 2023, then-President Williams—Plaintiff Broadbent's direct supervisor—left a display of an assortment of vegetables shaped as male genitalia, including a long zucchini referred to as a "zuweenie," on VP Sharp's front porch to "help" with his recovery from his vasectomy that day. Williams falsely, and without their knowledge or consent, attributed the innately sexual display to Plaintiffs, by listing Plaintiffs' names on an accompanying note containing sexual innuendo (although two of their names were misspelled). Photographs of the obscene display and note falsely attributed to Plaintiffs follow:



50. Earlier that day, Williams told his Chief of Staff, Courtney White, that he intended to drop off a gift for Sharp after Sharp's surgery, and Williams implied to White that the gift was going to be something funny that they could laugh about afterward.

51. Defendant Williams' misconduct was directed toward Plaintiffs in response to their execution of their duties within the OGC and OEC & TIX, including, but not limited to, the September 2021 Incident involving the sexual comments posted in the UMAC breakroom.

52. After receiving the innately sexual display and "zuweenie" note falsely listing Plaintiffs as the perpetrators, Sharp did not contact any of the Plaintiffs to notify them that their names were attributed to the obscene delivery he received.

53. Instead, shortly after the delivery, Sharp phoned his and Plaintiff Broadbent's supervisor/the University's president, Williams, and inquired whether he was the perpetrator of the vulgar display and note with sexual innuendo falsely attributed to Plaintiffs. Sharp texted Williams photos of the vulgar display, the note with Plaintiffs' names on it, and the RING doorbell footage showing a man (Williams) with a hoodie—cinched to disguise his face— making the delivery. Williams denied having any knowledge of, or involvement in, the delivery to Sharp. Williams did not take any action to discourage Sharp from further disseminating the photos and information associating Plaintiffs with the obscene delivery.

54. Sharp then called his close friend, VPSA Del Beatty, who also serves on the President's Cabinet with Plaintiff Broadbent, inquiring whether he made the delivery, and Sharp texted Beatty photos of the vulgar display, the note with sexual innuendo falsely attributing the delivery to Plaintiffs, and the RING doorbell footage link. Beatty denied any knowledge of, or involvement in, the delivery to Sharp. Beatty also did not notify Plaintiffs that their names were

13

attributed to the obscene delivery, nor did Beatty take any action to discourage Sharp from further disseminating the photos and information associating Plaintiffs with the obscene delivery.

**Defendants Repeatedly Disseminate the Sexual Obscenity**

55.   VP Sharp then sent a group chat to his eleven full-time UMAC team members with photos of the vulgar display, the note ascribing the "zuweenie" display to Plaintiffs, and the RING doorbell footage link showing the man (Williams) delivering the display and note.

56.   VP Sharp asked the UMAC Group who had made the delivery, to which Jared Madsen responded: "All Becky!!" (referencing Plaintiff Broadbent, the University's General Counsel). Another employee, Matt Black, responded "Please report Hazel to...Hazel" (referencing Plaintiff Sainsbury, the University's Title IX Coordinator). Brooke Ulrich commented, "I'm dying!!!!," and Stacy Schmidt contributed, "Most impressive zuweenie I've ever seen!" VP Sharp texted the group that Plaintiffs "really did their homework...(winking face emoji)," implying that Plaintiffs had assessed Sharp's private parts when purportedly selecting the size of the vegetables for the vulgar display which they purportedly delivered to him.

57.   Despite receiving Title IX training specific to their department—including their reporting obligations— as well as the University's annual Title IX compliance trainings, none of the UMAC employees or VP Sharp reported the delivery of the innately sexual display, the note containing the "zuweenie" sexual innuendo falsely attributed to Plaintiffs, or the retaliatory and harassing contributions on the UMAC Group Chat from Madsen, Schmidt, Sharp, Black, and Ulrich. Moreover, Jyl Hall falsely described the content of this group chat during Utah Tech's Title IX investigation, and Hall told the investigator she would not provide the additional screenshots (which would have revealed to the investigator Sharp's and his UMAC team's comments). Madsen and Schmidt were also deceitful to the investigator.

14

58.   The following morning, November 9, 2023, Williams brought his misconduct to campus when he showed Chief of Staff White a photo of the vulgar display which Williams delivered to Sharp the night before. Williams informed White that he left a note with Plaintiff Broadbent's and Plaintiff Sainsbury's names on it. White recognized the gravity of including Plaintiffs' names on the note given they were both female administrators with responsibilities for ensuring the University's Title IX compliance. Even so, White did not report the incident to the OGC, OEC & TIX, Human Resources, or the University's Whistleblower hotline, or to Plaintiff Broadbent when he sat next to her at a dinner that evening held in the presidential home for Cabinet members and Board of Trustees members.

59.   The next day, during the University's November 10, 2023, Board of Trustees business meeting, VP Sharp shared the photos of the vulgar display and note attributing it to Plaintiffs with another of Plaintiff Broadbent's Cabinet colleagues, Henrie Walton, Assistant to the President for Government and Community Relations. Walton denied his involvement in the delivery, and he recognized the clear connection of Plaintiffs' names being falsely listed on the obscene delivery as being due to Plaintiffs' response to the September 2021 Incident. Walton did not, however, request that Sharp cease disseminating the photos so damaging to Plaintiffs. Walton also did not inform Plaintiff Broadbent (who was present at the meeting) about what Sharp had shown him, nor did he report it to anyone else.

60.   Following the Board of Trustees' business meeting, VP Sharp then shared the photos of the vulgar display and sexual innuendo note falsely ascribing it to Plaintiffs yet again at the Board of Trustees luncheon, with many of the University's staff and administration present in addition to the Trustees.

61.    At the Board of Trustees luncheon, VP Sharp and VP Beatty beckoned Plaintiff Rasband over to their table purporting to need his legal assistance. Instead, they proceeded to first inquire about his interest in gardening, and then about OGC's involvement in the vulgar display and "zuweenie" note in the presence of at least four other upper-level University employees, including Assistant to the President Walton (who was already aware of the inappropriate content from Sharp's prior dissemination of the photos to him during the business meeting). Sharp informed Plaintiff Rasband that he had already inquired of Williams, Beatty, and Sharp's entire UMAC team, about the delivery.

62.    Plaintiff Rasband was shocked, embarrassed, and humiliated by this unexpected encounter in the presence of a group of administrators senior to him on campus and at the hands of two of Utah Tech's vice presidents. Despite the power differential, Plaintiff Rasband tried to make clear to this large group of Utah Tech Cabinet members and directors that he and the other members of the OGC and the Title IX Office had nothing to do with this offensive act and it was not something they would ever do.

**Utah Tech Fails to Provide an Adequate Process for Plaintiffs' Grievances**

63.    Based on Plaintiffs' knowledge at the time (which was limited to what they learned on November 10, 2023 from Rasband's shocking experience at the Board of Trustees' luncheon, and without any knowledge or expectation of Williams' involvement), Plaintiff Broadbent, on behalf of her direct reports, Plaintiffs Sainsbury and Rasband, and herself, reported the above incidents to Utah Tech's Executive Director of Human Resources, Travis Rosenberg, on November 12, 2023. Plaintiff Broadbent also informed Rosenberg of her intent to speak with Williams the following day, if possible, about the incidents.

16

64.   The following day, November 13, 2023, Plaintiff Broadbent reported the same incidents directly to then-President Williams in a one-on-one meeting, completely unaware that Williams perpetrated the vulgar display and "zuweenie" note, which he falsely ascribed to Plaintiffs. In their meeting, Williams was dismissive of Plaintiffs' reported concerns about the incidents (despite Williams stating that his (and Sharp's) running group all knew about the November 8, 2023, delivery), and Williams attempted to manipulate and silence Plaintiff Broadbent about the incidents by assuring her that Plaintiffs were "loved" and "part of the family."

65.   When Plaintiff Broadbent reported to Williams her belief that the vulgar acts and defamatory dissemination were in retaliation for prior incidents and complaints Plaintiffs made to Williams and Rosenberg about other matters (including Title IX and Equity Compliance issues) involving senior administrators, which had already created a hostile work environment for Plaintiffs, Williams dismissed Plaintiffs' report of retaliation, again without revealing to Plaintiff Broadbent that he, the University President and Plaintiff Broadbent's supervisor, was the actual perpetrator of the November 8, 2023 vulgar and defamatory delivery to VP Sharp.

66.   As their November 13, 2023, meeting concluded, Williams asked Plaintiff Broadbent to find out whether Plaintiffs Rasband and Sainsbury were interested in talking to Williams so he could also assure them that their concerns were not real and they were "loved" and "part of the family."

67.   Following the November 13, 2023, meeting with Plaintiff Broadbent, Williams immediately informed White in his adjacent office that Plaintiff Broadbent was upset about Sharp's and Beatty's dissemination of the delivery of the sexually offensive and vulgar display and note with Plaintiffs' falsely ascribed names, and Williams expressed to White his concern that

he would end up on the front page of the Chronicle of Higher Ed. Williams expressed no concern for the harm to Plaintiffs as a result of their names being associated with the delivery to a University Vice President of an obscene display and a sexual innuendo note.

68.    At several key points, Utah Tech, USHE, UBHE, OCHE and their employees and agents failed to provide Plaintiffs a timely and adequate remedial process pursuant to University policy for their Title IX and Title VII complaints of discrimination, sexual harassment, hostile work environment, and retaliation. Utah Tech and USHE, UBHE, and OCHE ignored or intentionally avoided the applicable policies, processes, and timelines which should have been afforded to Plaintiffs as employees of a Utah public institution of higher education.

69.    On November 15, 2023, Rosenberg informed Plaintiff Broadbent by phone that a witness (White) had informed Rosenberg that Williams perpetrated the innately sexual display and defamatory "zuweenie" note ascribing its delivery to Plaintiffs. Rosenberg asked to meet with Plaintiffs Broadbent and Rasband that afternoon, and in their meeting, Rosenberg informed them that Rosenberg in Human Resources was now investigating the matter.

70.    The afternoon of November 15, 2023, in his effort to silence Plaintiffs, Williams left Plaintiff Broadbent two separate messages inquiring whether she had talked with Plaintiffs Rasband and Sainsbury to see if they were interested in talking to Williams about what she reported to him on November 13, 2023.

71.    Rosenberg acknowledged to Plaintiffs Broadbent and Rasband in their November 15, 2023 meeting, that the University's Title IX policy (Policy 154) was implicated. Rosenberg was also aware that Plaintiff Sainsbury could not serve as Title IX Coordinator for a case in which she was a victim and potential complainant. However, no substitute Title IX Coordinator was provided by Utah Tech to Plaintiffs to conduct an intake meeting, to discuss needed

18

supportive measures, and to inquire about the parties' interest in Informal Resolution, as required by Title IX and University Policy 154. Additionally, Rosenberg decided to lie to Williams about his knowledge (from White) of Williams' involvement in the incidents, and Rosenberg falsely informed Williams that Plaintiff Broadbent initiated Rosenberg's investigation, rather than disclosing that Rosenberg was investigating based on White's report to him.

72.   Indeed, although Rosenberg, the University and the UBHE, USHE, and OCHE could have quickly retained an external Title IX Coordinator to conduct an intake meeting and discuss needed supportive measures with Plaintiffs, and to inquire whether the parties were mutually interested in engaging in the Informal Resolution process provided by the University's Title IX policy, they chose not to do so. Thus, they denied Plaintiffs rights afforded to them under federal law and University policy.

73.   In the days that followed Rosenberg's November 15, 2023 meeting with Plaintiffs Broadbent and Rasband, Rosenberg made clear to Plaintiffs that Utah Tech's and the UBHE, USHE, and OCHE's top priority was to refrain from contacting Plaintiffs. Broadbent and Sainsbury were not even interviewed by Rosenberg during his initial, overly narrow "investigation." Broadbent had to hurry and type up an account of her November 13, 2023, meeting with Williams and the underlying events of November 10-12, 2023, to forward to Rosenberg with the hope he would include it in his "investigation" report. Rosenberg made it clear that if Plaintiffs deemed the incidents to be "unwelcome" conduct and wanted the institution or UBHE, USHE, and OCHE to do something about the misconduct, then Plaintiffs had to formalize complaints under Policy 151, the University's staff grievance policy (which had an upcoming, short deadline).

19

74.   Rosenberg imposed this requirement on Plaintiffs despite the fact that Commissioner Landward and Utah Tech's Board of Trustees Chair Tiffany Wilson both learned from Williams on or about November 17, 2023, that he created and delivered to VP Sharp the November 8, 2023 vulgar display and "zuweenie" note ascribing it to Plaintiffs, and that an investigation was being conducted by Rosenberg. Plaintiffs should not have been forced to formalize complaints under Policy 151. Rather, since the University and USHE, UBHE, and OCHE were on notice of reported incidents of sexual harassment, the University should have followed the Title IX process by having a Title IX coordinator reach out to Plaintiffs for intake and supportive measures and a discussion of their potential interest in Informal Resolution, and the opportunity to formalize complaints under Title IX only if Plaintiffs opted to do so. Plaintiffs were given only the option to formalize their complaints under Policy 151 by November 28, 2023.

75.   As of November 17, 2023, both Utah Tech's Trustees' Chair, Wilson, and the UBHE, USHE, and OCHE's Commissioner, Landward, in addition to Utah Tech's Rosenberg, should have ensured a trained Title IX Coordinator was reaching out to Plaintiffs for an intake meeting, to discuss supportive measures, and to offer the opportunity for Informal Resolution.

76.   Instead, Plaintiffs were forced to quickly formalize complaints against Williams, Sharp, Beatty, Walton, and other administrators involved in the already-existing hostile work environment, Lacourse and Pedersen, in order to seek to remedy the hostile work environment, harassment, discrimination, retaliation, abusive conduct, and defamation which they experienced—all without being provided an opportunity for an informal process or remedy, and despite their rights under Title IX and University Policy 154 regarding Informal Resolution.

77.   Because of the concerted effort by Utah Tech and the UBHE, USHE, and OCHE to protect then-President Williams' and his senior administrators' reputations (after they had damaged Plaintiffs'), the information from Rosenberg's Human Resources investigation into the November 8th and 10th incidents was withheld from Plaintiffs until late spring 2024, when Rosenberg's November 2023 "investigation" summary was finally produced to Plaintiffs as part of an internal administrative process.

78.   On December 5, 2023, the UBHE, USHE, and OCHE's legal counsel, Adams, contacted each Plaintiff and informed them Defendants were still trying to determine how to process Plaintiffs' formal grievances against the individual Defendants. She informed them that the UBHE was hiring DHRM investigators to investigate Plaintiffs' formal grievances; that investigation notices would be issued later that week; and that more details would be provided to Plaintiffs.

79.   At the same time the entity Defendants were representing to Plaintiffs that they were being afforded an internal grievance process, and despite having express knowledge of Williams' misconduct, the UBHE, USHE, OCHE, and Utah Tech negotiated and provided Williams with an extraordinarily favorable separation agreement (a true and correct copy of which is attached hereto as Exhibit "C"), a lauded send-off by Utah Tech Board of Trustees' Chair Wilson on social media, and use of Utah Tech's media platforms for Williams to disseminate his desired narrative about his departure. All of this was done despite Plaintiffs' rights under Title IX to decide whether they wished to pursue Informal Resolution; without Plaintiffs' knowledge or input; and while misrepresenting to Plaintiffs that the Defendants were finally commencing the required Title IX process.

4854-3348-0433, v. 15

80.   In turn, Plaintiffs were abruptly notified by Adams on December 18 and 19, 2023, that their complaints against Williams were being dismissed by the UBHE with Williams' departure, because the UBHE would no longer have "jurisdiction" over Williams after he stepped down as President. Adams was the only point of contact provided by the Defendant entities to Plaintiffs for weeks, despite Adams being legal counsel for the UBHE, USHE, and OCHE. After Plaintiffs insisted that their Title IX complaints against Williams could not legally be dismissed, Adams claimed she "misspoke" about those claims being dismissed and the UBHE reluctantly provided a sham Title IX process while still dismissing Plaintiffs' complaints against Williams under other applicable University policies. True and correct copies of the UBHE's January 4, 2024, notification letters which Plaintiffs received from the UBHE are attached as Exhibit "D."

81.   To Plaintiffs' detriment, while the UBHE, USHE, and OCHE and Utah Tech secretly negotiated the favorable separation agreement for Williams, they also failed to take any action whatsoever concerning Plaintiffs' Formal Grievances against Sharp, Beatty, Walton, Lacourse, and Pedersen, thereby subjecting Plaintiffs to an ongoing hostile work environment and further defamation and retaliation.

82.   The message Plaintiffs received from the entity Defendants was clear: if you raise complaints against your President and other senior administrators at your public institution of higher education, you will not receive due process and you will face adverse consequences. Meanwhile those who perpetrate misconduct will be outwardly rewarded and receive protective treatment from the institution and its governing and advisory bodies.

**Utah Tech Further Retaliates Against Plaintiff Broadbent**

83.   In retaliation for being a complainant and witness in Plaintiffs' internal complaints against Williams, Sharp, Lacourse, and other senior University administrators, and for requesting supportive measures to attempt to restore her equal access to the workplace while Plaintiffs' internal complaints were pending, on February 26, 2024, Utah Tech's Interim President White, with assistance from Executive Director of Human Resources Rosenberg, placed Plaintiff Broadbent involuntarily on administrative leave until the University's investigation processes concluded (*i.e.*, an indeterminate period entirely controlled by the University), and required her to remain available during business hours for the University to contact her. In sharp contrast, none of the Defendant Respondents were placed on leave.

84.   During the involuntary leave imposed on her, White also prohibited Plaintiff Broadbent from coming to Utah Tech's premises without a demonstrated need, and required her to first, in writing, request approval from Rosenberg to do so.

85.   The manner in which Plaintiff Broadbent was banished from Utah Tech's premises was also humiliating and disruptive. Broadbent was ambushed by White and Rosenberg in a meeting calendared as a normal weekly one-on-one meeting between White and Broadbent. Despite Broadbent being a known complainant in internal grievance matters arising from her November 28, 2023, Formal Grievance against Williams, Sharp, Lacourse, Beatty, Walton, and Pedersen, Plaintiff Broadbent was not notified of the nature of the February 26, 2024, meeting in advance, and she was not provided with an opportunity to have an advisor or support person attend the meeting with her, in violation of University policy.

86.   After the meeting, in which she was notified of White's decision to immediately place her on leave (purportedly in her "best interest"), Plaintiff Broadbent was subjected to a

public "walk of shame" back to her office across campus with two Human Resources employees escorting her (Rosenberg and his team member, Dani Apo), as if she had committed a severe infraction or policy violation, instead of being the known recipient of multiple Utah Tech administrators' misconduct (about which she properly reported and in good faith grieved).

87.   Because her OGC team was still in their offices when she returned under Human Resources' supervision, Plaintiff Broadbent explained to her team, despite her humiliation, that as a purported supportive measure, Utah Tech was placing her on leave effective immediately for an unknown period of time and also banishing her from campus. In addition to having to quickly cancel her plans to attend a University gala event that evening, Broadbent had to immediately determine in Apo's and Rosenberg's presence which paper and digital files she might need to try and continue with her internal complaint processes and to meet imposed deadlines in those processes that week.

88.   Plaintiff Broadbent also had to immediately turn in her University-issued laptop, ID/building access card, office keys, and purchasing card to Rosenberg, as if she were a respondent who posed some risk to University operations or personnel, rather than an innocent complainant. In sharp contrast, under the terms of Williams' separation agreement, attached as Exhibit "C," Williams was allowed to keep his University-issued laptop, and to continue living in the presidential home rent-free for six months.

89.   In fact, prior to White summarily placing Plaintiff Broadbent on leave and banishing her from campus, Utah Tech had never placed a complainant involuntarily on administrative leave. Because Plaintiff Broadbent reported and internally grieved misconduct by senior University administrators, she was subjected to an action the University never before imposed on a complainant.

4854-3348-0433, v. 15

90.   After White summarily placed Plaintiff Broadbent involuntarily on leave, Utah Tech replaced her with an Assistant Attorney General as "team lead," denied Plaintiff Broadbent the rights, privileges, and many benefits of her position, and severely impeded her ability to participate as a complainant and witness in Plaintiffs' grievance processes.

91.   Not only were these retaliatory acts extremely traumatic for Plaintiff Broadbent, causing her to consider dismissing her internal grievances against Williams and the remaining senior administrator respondents and seek reinstatement (which was likely the intent behind these retaliatory acts), but they were also demoralizing and traumatic for Plaintiff Rasband to witness, and for Plaintiff Sainsbury to learn about. As co-complainants in the internal complaints against Williams, Sharp, Lacourse, and Beatty, Plaintiffs Rasband and Sainsbury have feared that they will also be removed from their roles and banished from campus as well.

92.   On information and belief, between January 5, 2024, and February 26, 2024, knowing Plaintiff Broadbent was a complainant and witness in grievances against Williams, Sharp, Beatty, Lacourse, Pedersen, and Walton, Defendant Wilson made disparaging and false statements about Plaintiff Broadbent and the OGC to Defendant White (and potentially others) and she sought to have Plaintiff Broadbent's employment terminated.

93.   On information and belief, on or about March 20, 2024, knowing Plaintiff Broadbent was a complainant and witness in grievances against Williams, Sharp, Beatty, Lacourse, Pedersen, and Walton, Defendant Wilson made disparaging and false statements about Plaintiff Broadbent and the OGC to members of the UBHE Audit Committee, and potentially others. Specifically, Wilson falsely asserted that the OGC's activity had been vindictive, and that the OGC had isolated itself and was not assisting Utah Tech.

25

94.   On information and belief, knowing Plaintiff Broadbent was a complainant and witness in grievances against Williams, Sharp, Beatty, Lacourse, Pedersen, and Walton; knowing White had involuntarily placed Plaintiff Broadbent on leave; and knowing Plaintiff Broadbent's complaints against the University's senior administrators have been substantiated through the University's investigations, Defendant Wilson has continued to make disparaging and false statements about Plaintiff Broadbent and the OGC to Defendant White (and potentially others) and Wilson has sought to have Plaintiff Broadbent's employment terminated.

95.   On information and belief, Plaintiffs Sainsbury and Broadbent learned in April 2024 that Utah Tech, and/or one or more of the individual Defendants, circulated a false rumor on and off campus that Plaintiff Broadbent and/or OGC harassed Plaintiff Sainsbury. This false rumor was circulated to hide and explain away the reasons for Plaintiff Broadbent's involuntary administrative leave. However, Plaintiff Broadbent and OGC never harassed Plaintiff Sainsbury, and Plaintiff Sainsbury never filed a complaint for harassment against Plaintiff Broadbent or OGC.

96.   After ten weeks of being on involuntary leave, and with little to no communication from Utah Tech, Plaintiff Broadbent inquired through the Interim Title IX Coordinator retained by Utah Tech and USHE, UBHE, and OCHE when the University planned to allow her to return to her role. She was informed that the leave was intended to "continue through the conclusion of the investigations," although the subject investigations under Human Resources' oversight were completed by that time. This was further retaliation against Plaintiff Broadbent for engaging in the additional protected activity of filing charges of discrimination with federal agencies by the legally-mandated 180-day deadline.

4854-3348-0433, v. 15

97.    It has now been over six months since the internal investigations of four respondents (Lacourse, Pedersen, Beatty, and Walton) under Rosenberg's Human Resources oversight were completed, and over four months since the Sharp investigation under the GRS Interim Title IX Coordinator's oversight was completed. Yet, Plaintiff Broadbent has received no communication as to when—if ever—she will be allowed to return to her role and to campus. Her September 2024 request (through another Interim Title IX Coordinator) to be reinstated has been met with silence from her employer, Utah Tech. She has, however, been informed through an investigation process, that a Trustee (presumably Wilson) still seeks to have her employment terminated.

98.    During the time Plaintiff Broadbent has been involuntarily out on leave, she has been prevented from supervising her team and from receiving her annual self-evaluation. She has also been excluded from all professional development opportunities (including a pre-approved NACUA General Counsel Institute, a USHE General Counsel Retreat in Moab, an out of state threat assessment conference she previously attended annually, and multiple other continuing legal education opportunities), all Utah Tech Staff activities and numerous other University events attended by Cabinet members in the months since she was placed on leave—including the Fire and Ice Gala, the Great Race, multiple end of year awards banquets, two Commencement ceremonies, Staff Development Day, the August Cabinet Retreat at Entrada, recent Fall 2024 back to school events, such as the Welcome Back BBQ, Convocation, Freshman Welcome Wednesday, and dorm move-in days—and all Cabinet meetings, University Council meetings, and Board of Trustees meetings and functions which she would normally attend as General Counsel.

99.   All the while, Utah Tech's remaining senior administrators who actively participated in creating a hostile work environment for Plaintiffs and/or retaliated against Plaintiffs—Sharp, Beatty, Lacourse, Walton, Pedersen, and White—have been allowed to participate freely in professional events and trainings afforded by their leadership roles, while also being held out to the USHE, Utah Tech, and St. George communities as leaders of integrity who uphold the University's stated values (including "a safe, tolerant and welcoming community" with an "open culture grounded on principles of honesty, integrity, sharing, transparency, accountability, mutual respect…") and policies (including Equity Compliance, Title IX, and Abusive Conduct).

**Utah Tech Further Retaliates Against Plaintiffs Rasband and Sainsbury**

100.  In retaliation for engaging in protected activity by internally complaining against Utah Tech's leaders who targeted them, harassed them, defamed them, and engaged in abusive conduct toward them, and in retaliation for engaging in subsequent additional protected activity by filing charges of discrimination with federal agencies by the required deadlines, Plaintiff Rasband has been subjected to an openly hostile work environment and has been frozen out of many of his duties in the Office of General Counsel. He has been left out of leadership meetings and decision-making processes that he normally would have been involved in prior to making these complaints. For example, Rasband was excluded from serving on the hiring committee for a new police chief; and he was not named the "team lead" when the University placed Plaintiff Broadbent involuntarily on leave, despite routinely serving as her back-up if she was absent. As a result of Plaintiff Broadbent's shocking banishment, Plaintiff Rasband has feared that he too will face the same involuntary removal from campus as his supervisor Plaintiff Broadbent did, if he complains about his current hostile working conditions.

28

101. In retaliation for internally complaining against Utah Tech's leaders and for engaging in additional protected activity by filing charges of discrimination with federal agencies by the required deadlines, Plaintiff Sainsbury has been deprived of the support that her office requires, and she has been subjected to an ongoing openly hostile work environment. Plaintiff Sainsbury's supervision was reassigned to Interim President White, where she was left without communication, supervision, or support for her office for several months after Plaintiff Broadbent was placed on involuntary leave. As a result of Plaintiff Broadbent's banishment, Plaintiff Sainsbury has feared that she too will face the same involuntary removal from campus as her former supervisor, Plaintiff Broadbent, did if Plaintiff Sainsbury complains about her current hostile working conditions.

102. Additionally, Plaintiff Sainsbury was denied equal participation in the Trailblazer Leadership Development overseen by Director Rosenberg and taught by VP Sharp and VP Beatty, who were instructed not to communicate with her during the pendency of her grievance processes. Sainsbury was also not afforded an equal opportunity to be selected by Chair Wilson to present her project to the Utah Tech Board of Trustees because the Trustees were aware of her grievance against senior administrators.

### Utah Tech's and the UBHE, USHE, and OCHE's Outsourcing of the Title IX Process Failed

103. Utah Tech and UBHE's, USHE's, and OCHE's attempt to delegate some of their mandated legal responsibilities to an external vendor has failed to Plaintiffs' detriment. These Defendants hired Grand River Solutions (GRS) to handle some of the processes discussed above, yet Defendants failed to maintain proper oversight of the vendor, such that those processes have been sham processes, both biased and unrecognizable to Plaintiffs as practitioners. Time and

29

again, GRS demonstrated a bias in favor of the Defendants that harmed Plaintiffs' rights under

Title IX and University policy.

104. Nothing about Utah Tech's and USHE's, UBHE's, and OCHE's responses to

Plaintiffs' reported concerns and formal complaints resemble the appropriate Title IX process

under which Plaintiffs' reported concerns and formal complaints were required to be handled by

law and under University Policy 154.

### FIRST CAUSE OF ACTION
**(Discrimination under Title IX, 20 U.S.C. § 1681—Against Defendants Utah Tech, UBHE, USHE, and OCHE)**

105. Plaintiffs adopt and fully incorporate the allegations of the preceding paragraphs

as if they were set forth herein.

106. Utah Tech and the UBHE, USHE, and OCHE, both through their own actions,

and through the actions of Defendants Williams, Sharp, Madsen, and Black, subjected Plaintiffs

to discriminatory and disparate treatment and failed to follow the protections required by Title

IX.

107. As employees of a Utah public institution of higher education, Plaintiffs are

members of a protected group, they were subject to unwelcome harassment and discrimination

by Utah Tech's leaders and administrators, the harassment and discrimination was based on sex,

and because of the severity and pervasiveness of the harassment, discrimination and retaliation,

the terms and conditions of Plaintiffs' employment was altered.

108. Utah Tech and the UBHE, USHE, and OCHE demonstrated deliberate

indifference to Plaintiffs' complaints of the individual Defendants' sexual harassment and

misconduct. Utah Tech and the UBHE, USHE, and OCHE had knowledge of this misconduct,

4854-3348-0433, v. 15

and their responses to Defendants' known acts of harassment and discrimination was clearly unreasonable in light of the known circumstances.

## SECOND CAUSE OF ACTION
**(Retaliation under Title IX, 20 U.S.C. § 1681, 34 C.F.R. § 106.71 Against Defendants Utah Tech, UBHE, USHE, and OCHE)**

109.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

110.  Plaintiffs participated in a protected activity under federal law when they reported and filed sexual harassment complaints internally with Utah Tech under University Policy 154 and Policy 164, and when Plaintiffs filed complaints externally with the Equal Employment Opportunity Office ("EEOC") and the Office of Civil Rights ("OCR") by the required 180-day deadlines.

111.  Utah Tech subjected Plaintiffs to adverse employment actions by, among other things, failing to provide supportive measures to all Plaintiffs and failing to mitigate the hostile work environment for all Plaintiffs; placing Plaintiff Broadbent on involuntary leave and continuing said leave indefinitely; causing Plaintiff Broadbent to be excluded from her role in the OGC, on University Council, on Cabinet, and as an advisor to the Board of Trustees; causing Plaintiff Broadbent to miss professional development opportunities; declining to use Plaintiff Rasband in his capacity within the OGC and as "team lead" in Broadbent's absence; and by denying Plaintiff Sainsbury adequate supervision and support in her professional responsibilities, as well as detrimentally impacting her professional development opportunities.

112.  Utah Tech retaliated against Plaintiffs through the actions of Lacourse and Pedersen for Plaintiffs' protected activities of responding to Title IX incidents, enforcing compliance with Title IX, and advising and providing oversight over the University Title IX

31

processes, by Lacourse's and Pedersen's misconduct in their August 2023 meeting with Plaintiff Rasband.

113.  Utah Tech retaliated against Plaintiffs through the actions of Williams for Plaintiffs' protected activities of responding to Title IX incidents, enforcing compliance with Title IX, and advising and providing oversight over the University Title IX processes, when Williams created and delivered an innately sexual display of vegetables and accompanying note containing sexual innuendo attributing the obscene display to Plaintiffs; and when Williams deceived Plaintiff Broadbent about his involvement in the November 8, 2023 delivery during and after their November 13, 2023 meeting in which she reported Plaintiffs' concerns to him; and when Williams subsequently attempted to silence Plaintiffs by seeking to meet with Plaintiffs Rasband and Sainsbury to assure them their feelings of humiliation were not real, and that they did not need to be concerned about their reputational damage as a result of the public dissemination of the vulgar and defamatory delivery.

114.  Utah Tech retaliated against Plaintiffs through the actions of Sharp and his UMAC team for Plaintiffs' protected activities of responding to Title IX incidents enforcing compliance with Title IX (including the September 2021 Incident involving the sexual comments posted in the UMAC breakroom), and advising and providing oversight over the University Title IX processes by their misconduct in November, 2023 and during the University's investigations.

115.  The adverse actions suffered by Plaintiffs were caused by Defendants in direct response to Plaintiffs' protected activity.

**THIRD CAUSE OF ACTION**
**(Discrimination Based on Sex under Title VII, 42 U.S.C. § 2000e, *et. seq* – Broadbent and Sainsbury Against Utah Tech)**

116.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

117.  Broadbent and Sainsbury are members of a protected class, are two of very few female administrators on campus, and have been subjected to unwelcome harassment and discrimination by Utah Tech's leaders and administrators, the harassment and discrimination was based on sex, and because of the pervasiveness of the harassment, the harassment and discrimination altered their employment and created an abusive working environment.

**FOURTH CAUSE OF ACTION**
**(Discrimination Based on Race under Title VII, 42 U.S.C. § 2000e, *et. seq* – Sainsbury Against Utah Tech)**

118.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

119.  Sainsbury is a member of a protected class, was subjected to unwelcome harassment and discrimination by Utah Tech's leaders and administrators, the harassment and discrimination was based on Sainsbury's race, and because of the pervasiveness of the harassment, the harassment and discrimination altered her employment and created an abusive working environment.

**FIFTH CAUSE OF ACTION**
**(Discrimination Based on National Origin under Title VII, 42 U.S.C. § 2000e, *et. seq* – Sainsbury Against Utah Tech)**

120.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

121.  Sainsbury is a member of a protected class, was subjected to unwelcome harassment and discrimination by Utah Tech's leaders and administrators, the harassment and discrimination was based on Sainsbury's race, and because of the pervasiveness of the harassment, the harassment and discrimination altered her employment and created an abusive working environment.

## SIXTH CAUSE OF ACTION
**(Retaliation under Title VII, 42 U.S.C. § 2000e *et seq.* for Reporting Sex Based Discrimination – Broadbent and Sainsbury Against Utah Tech)**

122.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

123.  Broadbent and Sainsbury, two of the very few female administrators on campus, participated in a protected activity under federal law when they reported and filed sexual harassment and discrimination complaints with Utah Tech.

124.  Utah Tech subjected Broadbent and Sainsbury to adverse employment actions by, among other things, failing to provide supportive measures to all and failing to mitigate the hostile work environment for Broadbent and Sainsbury, placing Broadbent on involuntary leave, causing Broadbent to be excluded from her role in the OGC, causing Broadbent to miss professional development opportunities, and denying Sainsbury support in her professional responsibilities.

125.  These adverse actions were caused by Defendants in direct response to Broadbent's and Sainsbury's protected activity.

## SEVENTH CAUSE OF ACTION
**(Retaliation under Title VII, 42 U.S.C. § 2000e *et seq.* for Reporting Race Based Discrimination – Sainsbury Against Utah Tech)**

34

126.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

127.  Sainsbury participated in a protected activity under federal law when she reported and filed race discrimination complaints.

128.  Utah Tech subjected Sainsbury to adverse employment actions by, among other things, failing to mitigate the hostile work environment for Sainsbury and denying Sainsbury support in her professional responsibilities.

129.  These adverse actions were caused by Defendants in direct response to Sainsbury's protected activity.

### EIGHTH CAUSE OF ACTION
**(Retaliation under Title VII, 42 U.S.C. § 2000e *et seq.* for Reporting National Origin Based Discrimination – Sainsbury Against Utah Tech)**

130.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

131.  Sainsbury participated in a protected activity under federal law when she reported and filed national origin discrimination complaints.

132.  Utah Tech subjected Sainsbury to adverse employment actions by, among other things, failing to mitigate the hostile work environment for Sainsbury and denying Sainsbury support in her professional responsibilities.

133.  These adverse actions were caused by Defendants in direct response to Sainsbury's protected activity.

### NINTH CAUSE OF ACTION
**(Defamation *per se*—Against Defendants Utah Tech, Williams, Sharp, Beatty, Lacourse, Pedersen, Madsen, Schmidt, Black, Ulrich, and Wilson)**

134.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

135.  Defendant Williams defamed Plaintiffs when he falsely ascribed Plaintiffs' names to a note containing sexual innuendo accompanying an innately vulgar sexual display and delivered the display and note to Sharp.

136.  Williams' ascription was false, intentional, injurious, unprivileged, and published to third parties.

137.  Williams acted within his scope of employment as president of Utah Tech when he typed the note with Plaintiffs' names on it in the presidential residence, and delivered the vulgar display and "zuweenie" note with Plaintiffs' names falsely ascribed to the front porch of VP Sharp.

138.  Williams further acted within the course and scope of his employment when he denied his involvement to Sharp immediately after making the November 8, 2023 delivery when contacted about it by Sharp, which denial resulted in Sharp's dissemination of the vulgar display and "zuweenie" note which Williams ascribed to Plaintiffs.

139.  Williams' deceit to Plaintiff Broadbent in their November 13, 2023 meeting and his statements to White immediately following that meeting, contributed to, and resulted in, additional defamation to Plaintiffs.

140.  Utah Tech, Landward, Wilson, and the UBHE, USHE, and OCHE knew of Williams' misconduct and condoned it by providing him a highly favorable separation agreement in lieu of discipline.

141.  Defendant Sharp defamed Plaintiffs when he disseminated the obscene delivery and sexual innuendo note to Beatty on November 8, 2023, to 11 full-time employees on Sharp's

UMAC team on November 8 and 9, 2023 via a Group Chat, and to Defendant Walton during the November 10, 2023 Board of Trustees business meeting, as well as potentially to others, after receiving the November 8, 2023, obscene delivery from Williams.

142. Defendants Sharp, Madsen, Schmidt, Black, and Ulrich defamed Plaintiffs when they contributed knowingly false comments about Plaintiffs and supporting the false attribution of the obscene delivery to Sharp on the lewd November 8-9, 2023, UMAC Group Chat, in furtherance of the false, intentional, injurious, and unprivileged, publication of Williams' vulgar display delivery.

143. Defendants Sharp and Beatty defamed Plaintiffs when they attributed the vulgar display and note with sexual innuendo delivery to Plaintiffs in front of others at the November 10, 2023, Utah Tech Board of Trustees' luncheon and on other occasions.

144. These repeated untruthful attributions of the vulgar display and note with sexual innuendo purportedly being from Plaintiffs, in front of Plaintiffs' peers and colleagues, were false, intentional, injurious, unprivileged, and published to third parties.

145. Utah Tech, Landward, Wilson, and the UBHE, USHE, and OCHE knew of Williams', Sharp's, and Beatty's misconduct, and condoned it by failing to take immediate action to stop it and prevent its recurrence, and by allowing these Defendants to continue using University resources and media channels to further their own names and reputations.

146. Wilson's comments to White seeking to have Plaintiff Broadbent fired, both before and after White placed her on involuntary leave, were false, intentional, injurious, unprivileged, and published to a third party, White.

147. Upon information and belief, Utah Tech and/or one or more of the individual Defendants or John and Jane Doe Defendants circulated a false rumor on and off campus that

Plaintiff Broadbent and/or OGC harassed Plaintiff Sainsbury. This false rumor was intentional, injurious, unprivileged, and published to third parties.

148.  On or about March 20, 2024, Wilson made false and retaliatory statements about Plaintiffs to the UBHE Audit Committee which were intentional, injurious, and unprivileged.

149.  Wilson's false statements are inherently harmful to Plaintiffs given their professional roles.

150.  The false attributions to Plaintiffs of the vulgar display and note containing sexual innuendo, as well as the false rumor about OGC and/or Plaintiff Broadbent allegedly harassing Plaintiff Sainsbury, charges the Plaintiffs with conduct that is incompatible with the exercise of their offices and professions at Utah Tech, and they are inherently harmful to Plaintiffs, given their positions and responsibilities in Utah Tech's OGC and the OEC & TIX.

151.  Plaintiffs have suffered damages as a result of the aforenamed Defendants' actions.

## TENTH CAUSE OF ACTION
### (False Light—Against All Defendants)

152.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

153.  Defendants gave publicity to matters concerning Plaintiffs that has placed the Plaintiffs before the public in a false light.

154.  The false light in which Plaintiffs have been placed would be highly offensive to a reasonable person.

155.  Defendants had knowledge of, or acted in reckless disregard as to, the falsity of the publicized matters and the false light in which Plaintiffs would be placed.

156.  Plaintiffs have suffered damages as a result of Defendants' actions.

## ELEVENTH CAUSE OF ACTION
### (Breach of Contract- Plaintiffs Against Defendant Utah Tech)

157.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

158.  Utah Tech has a contract with each of the Plaintiffs requiring it to afford each Plaintiff with timely, neutral and unbiased grievance processes.

159.  Utah Tech breached its contracts with Plaintiffs by failing to honor its obligations to provide Plaintiffs with timely, adequate and impartial grievance processes as outlined in the University's policies and guidelines.

160.  Plaintiffs have suffered damages as a result of Utah Tech's breach of contract.

## TWELFTH CAUSE OF ACTION
### (Breach of Contract– Broadbent against Defendant Utah Tech)

161.  Plaintiffs adopt and fully incorporate the preceding allegations as if set they were forth herein.

162.  Utah Tech has a contract with Plaintiff Broadbent requiring it to provide her professional development opportunities.

163.  Utah Tech breached its contract with Plaintiff Broadbent by failing to support her in her professional development as required by University Policy 358. Since she was forced out on involuntary administrative leave over eight months ago, Plaintiff Broadbent has missed multiple professional development opportunities. Despite Utah Tech's express duty to support Plaintiff Broadbent's professional development per Policy 358, the University has repeatedly prevented her from key development opportunities by placing her on, and making her remain on, involuntary leave with an indeterminate, University-controlled end date for said leave.

39

164.  Plaintiff Broadbent has suffered damages as a result of Utah Tech's breach of contract.

## THIRTEENTH CAUSE OF ACTION
### (Tortious Interference with Contract– Against Defendants Williams, Sharp, Lacourse, Beatty, Walton, White, Wilson, Rosenberg, Landward, Adams, and Hall)

165.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

166.  Utah Tech has a contract with Plaintiffs.

167.  Utah Tech breached its contract with Plaintiffs by failing to honor its obligations to support Plaintiffs with adequate and impartial grievance processes as outlined in the University's Policy guidelines.

168.  Defendants Williams, Sharp, Lacourse, Beatty, Walton, Pedersen, White, Wilson, Rosenberg, Landward, Adams, and Hall tortiously interfered with Plaintiffs' contracts through improper means and inhibited their abilities to fulfill their employment obligations to Utah Tech, by Defendants conducting or contributing to a sham investigation and grievance process in response to Plaintiffs' complaints; by making defamatory, false, injurious, and disparaging statements; by engaging in retaliatory conduct; and/or by withholding evidence; and/or by being dishonest in the internal investigation processes.

169.  Moreover, by placing and requiring Plaintiff Broadbent to remain on involuntary leave, declining to use Plaintiff Rasband in his capacity within the OGC, and excluding Plaintiff Sainsbury from her responsibilities and opportunities while denying her proper supervisory support, Defendant White has inhibited Plaintiffs' ability to fulfill their employment obligations to Utah Tech.

4854-3348-0433, v. 15

170.  Plaintiffs have suffered damages as a result of Defendants' tortious interference with their contracts.

### FOURTEENTH CAUSE OF ACTION
**(Intentional or Negligent Infliction of Emotional Distress–Against Defendants Williams, Sharp, Beatty, Walton, Lacourse, Pedersen, White, Rosenberg, Landward, Adams, Wilson, Madsen, Hall, Schmidt, Black, and Ulrich)**

171.  Plaintiffs adopt and fully incorporate the preceding allegations as if they were set forth herein.

172.  Defendants Williams, Sharp, Beatty, Walton, Lacourse, Pedersen, White, Rosenberg, Landward, Adams, Wilson, Madsen, Hall, Schmidt, Black, and Ulrich intentionally or negligently inflicted emotional distress on Plaintiffs.

173.  By ascribing the vulgar display to Plaintiffs in front of their peers and colleagues, Williams, Sharp, Beatty, Walton, Madsen, Schmidt, Black, and Ulrich intentionally engaged in outrageous conduct with the purpose of inflicting emotional distress.

174.  By their acts, omissions, and communications to Plaintiffs, Defendants Adams, Landward, Rosenberg, and White inflicted emotional distress on Plaintiffs.

175.  By having Broadbent escorted across campus by Human Resources and immediately required to return her University-issued laptop, ID/access card, keys, and P-Card to Rosenberg, and immediately banishing her from campus, all through no fault of her own, White and Rosenberg intentionally or negligently inflicted emotional distress on the Plaintiffs.

176.  Plaintiffs suffered severe physical and emotional distress as a result.

177.  At a minimum, Defendants Williams, Sharp, Beatty, Walton, Rosenberg, White, Madsen, Schmidt, Black, and Ulrich unintentionally caused emotional distress to Plaintiffs and should have readily realized that their conduct involved an unreasonable risk of causing such distress.

41

## DEMAND FOR JURY TRIAL

Plaintiffs request that this matter be tried before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants, jointly and severally, as follows:

A.      For judgment on all claims and causes of action against Defendants;

B.      For an award of all economic and non-economic damages caused by Defendants' conduct, including compensatory damages, in an amount to be determined at trial, damages for emotional distress, pain and suffering, humiliation, and as applicable, plus interest, in an amount to be determined at trial;

C.      For an award of punitive damages in an amount to be determined at trial;

D.      For an award of pre-judgment and post-judgment interest as allowed by law, as applicable;

E.      For an award of all of Plaintiffs' attorneys' fees and costs of suit, including all costs and expenses incurred through the collection of judgment;

F.      For an award of equitable relief in an amount to be determined at trial; and

G.      For an award of any other legal or equitable relief as the court deems just and proper.

DATED:  November 7, 2024.


**COHNE KINGHORN, P.C.**

/s/ Lisa R. Petersen
Lisa R. Petersen
Amy L. Herrington
*Attorneys for Plaintiffs*

42