JAQUALIN FRIEND PETERSON (6226)
BRADLEY BLACKHAM (8703)
DANIEL R. WIDDISON (11979)
BRETT ANDRUS (16659)
Assistant Utah Attorneys General
DEREK E. BROWN (10476)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
jfpeterson@agutah.gov
bblackham@agutah.gov
dwiddison@agutah.gov
brettandrus@agutah.gov
*Attorneys for Defendant Utah Tech University, Matt Black, Jyl Hall, Jared Madsen, Stacy Schmidt, Brook Ulrich, Travis Rosenberg, Shane B. Smeed and Courtney White*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, SOUTHERN REGION

| | |
|---|---|
| REBECCA BROADBENT, JARED RASBAND, AND HAZEL SAINSBURY,<br><br>*Plaintiffs*,<br><br>v.<br><br>UTAH TECH UNIVERSITY *et al.*,<br><br>*Defendants*. | **DEFENDANTS UTAH TECH UNIVERSITY, MATT BLACK, JYL HALL, JARED MADSEN, STACY SCHMIDT, BROOK ULRICH, TRAVIS ROSENBERG, SHANE B. SMEED AND COURTNEY WHITE'S MEMORANDUM IN SUPPORT OF PARTIAL MOTION TO DISMISS**<br><br>Case No. 4:24-cv-00091-DN-PK<br><br>Judge David Nuffer<br>Magistrate Judge Paul Kohler |

Pursuant to Fed. R. Civ. P. (8), 12(b)(1), 12(b)(6), and DUCiv R. 7-1, , Defendants Utah Tech University ("Utah Tech" or "University"), Courtney White, Travis Rosenberg, Matt Black, Jyl Hall, Jared Madsen, Stacy Schmidt, Shane B. Smeed, Brooke Ulrich (collectively,

"Defendants"), by and through counsel of record, Jaqualin Friend Peterson, Daniel Widdison,

Bradley Blackham and Brett Andrus, Assistant Attorneys General, file their Partial Motion to

Dismiss for Lack of Jurisdiction and Failure to State a Claim Upon Which Relief May Be

Granted and Memorandum in Support thereof and ask the Court to dismiss as it relates to such

Defendants the First, Tenth, Eleventh, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth,

Eighteenth, Nineteenth Twentieth, and Twenty-first Causes of Action of Plaintiffs' Amended

Complaint.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

SUMMARY OF THE ISSUES AND REQUEST FOR RELIEF .................................................... 1

BACKGROUND FACTS .......................................................................................................... 4

ARGUMENT ......................................................................................................................... 11

I.    STANDARD OF REVIEW ............................................................................................ 11

II.   PLAINTIFFS' FIRST CAUSE OF ACTION FAILS TO STATE A CLAIM AS THERE
      IS NO RECOGNIZED PRIVATE RIGHT OF ACTION UNDER TITLE IX FOR
      DISCRIMINATION IN EMPLOYMENT. ........................................................................ 14

III.  PLAINTIFFS' TENTH, ELEVENTH, THIRTEENTH, FOURTEENTH AND
      FIFTEENTH CAUSES OF ACTION ARE BARRED BY THE UTAH
      GOVERNMENTAL IMMUNITY ACT. ........................................................................... 18

      A.  Governmental Function .................................................................................... 19

      B.  Waiver ............................................................................................................... 20

          1.  Immunity for Individual Government Employees .................................... 20

              a. The UMAC Defendants ...................................................................... 21

              b. Defendants Smeed, White and Rosenberg. ......................................... 24

      C.  Interference With Prospective Economic Relations Against All Defendants. ............. 28

      D.  The UGIA Contains No Waiver for Intentional Torts including Defamation, False
          Light, and Intentional Interference with Existing and Prospective Economic
          Relations.,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 28

      E.  Exceptions to UGIA's Waiver of Immunity for State-Law Tort Claims Based in
          Negligence. ........................................................................................................ 29

IV.   PLAINTIFFS' TENTH, ELEVENTH, THIRTEENTH, FOURTEENTH AND
      FIFTEENTH CAUSES OF ACTION SHOULD BE DISMISSED FOR FAILURE TO
      STATE A CLAIM ON THEIR MERITS. ......................................................................... 30

      A.  Plaintiffs' Tenth Cause of Action for Defamation Should be Dismissed. .................... 30

      B.  Plaintiffs' Eleventh Cause of Action for False Light Should Be Dismissed. ................ 35

      C.  Plaintiffs' Thirteenth Cause of Action for Tortious Interference With Existing
          Economic Relations Should Be Dismissed. ...................................................... 37

      D.  Plaintiff's Fourteenth Cause of Action for Intentional Interference With Prospective
          Economic Relations Should Be Dismissed. ...................................................... 40

      E.  Plaintiff's Fifteenth Cause of Action for Intentional Infliction of Emotion Distress
          should also be dismissed. .................................................................................. 41

V.    PLAINTIFFS' SIXTEENTH, EIGHTEENTH, AND TWENTIETH CAUSES OF
ACTION CANNOT ESTABLISH A VIOLATION OF 42 U.S.C. § 1983 BECAUSE
UTAH TECH IS NOT A PERSON. .................................................................................. 42

VI.   PLAINTIFFS' SIXTEENTH, EIGHTEENTH, AND TWENTIETH CAUSES OF
ACTION CANNOT ESTABLISH A VIOLATION OF 42 U.S.C. § 1983 BECAUSE
THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED
IMMUNITY……………………………………………………………………………………………...43

A.    Plaintiff's Sixteenth Cause of Action for Deprivation of Property Without Due Process
Fails to State a Claim. ...................................................................................... 46

1.    Broadbent does not have a property interest in her continued employment............. 47

2.    Plaintiffs do not have a property interest in a specific investigatory process........... 48

3.    Plaintiffs have not stated a procedural due process claim with respect to the
terminations, if any. .................................................................................... 49

B.    Plaintiffs' Eighteenth Cause of Action for Deprivation of Liberty Interest Fails to State
a Claim. ........................................................................................................ 50

C.    Plaintiffs' Twentieth Cause of Action for Violation of the First Amendment Fails to
State a Claim. ................................................................................................. 51

VII.  PLAINTIFFS' SEVENTEENTH AND NINETEENTH CAUSES OF ACTION ARE
BARRED BY SOVEREIGN IMMUNITY. .................................................................... 54

A.    As An Arm of the State of Utah, Utah Tech Retains Sovereign Immunity from Claims
Arising Under the State Constitution. ................................................................. 54

VIII. PLAINTIFFS' TWENTY-FIRST CAUSE OF ACTION IS CONTRARY TO
ESTABLISHED, CONTROLLING, PRECEDENT. ..................................................... 60

A.    Article I, Section 11, of the Utah Constitution Does Not Render the UGIA
Unconstitutional. ............................................................................................. 60

1.    Plaintiff has not established the abrogation of a common law cause of action. ....... 62

2.    The fact that Plaintiff has not, and cannot, establish an abrogation of an existing
remedy precludes any analysis of the second and third parts of the *Berry* test. ....... 68

CONCLUSION ..................................................................................................................... 69

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aguila v. Planned Parenthood of Utah*,
2023 UT App 49 ........................................................................................................... 24

*Albright v. Rodriquez*,
51 F.3d 1531 (10th Cir. 1995) ..................................................................................... 45

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ..................................................................................................... 14

*Ambus v. Utah State Bd. of Educ.*,
858 P.2d 1372 (Utah 1993) .......................................................................................... 43

*Ameen v. Merck & Co.*,
226 Fed. Appx. 363 (5th Cir. 2007) ............................................................................ 38

*Asbill v. Hous. Auth. of Choctaw Nation of,*
*Okla.*, 726 F.2d 1499 (10th Cir.1984) ......................................................................... 40

*Ashcroft v. al-Kidd*,
131 S. Ct. 2074 (2011) ................................................................................................. 45

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 11, 12

*Atiya v. Salt Lake Cnty.*,
852 P.2d 1007 (Utah App. 1993) ................................................................................. 29

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 11, 12

*Benavides v. City of Oklahoma City*,
508 F. App'x 720 (10th Cir. 2013) .............................................................................. 39

*Bennett v. Jones, Waldo, Holbrook & McDonough*,
2003 UT 9, 70 P.3d 17 ................................................................................................. 42

*Berry ex rel. Berry v. Beech Aircraft Corp.*,
717 P.2d 670 (Utah 1985) ............................................................................................ 55

*Bingham v. Board of Educ.*,
118 Utah 582, 223 P.2d 432 (1950) ............................................................................. 61

*Bingham v. Gourley*,
2024 UT 38, 556 P.3d 53 ............................................................................................. 56

*Birkner v. Salt Lake Cnty.*,
771 P.2d 1053 (Utah 1989) ..................................................................................... 19, 20

*Blackner v. Dep't of Transp.*,
2002 UT 44, 48 P.3d 949 ............................................................................................. 18

*Brehany v. Nordstrom, Inc.*,
812 P.2d 49 (Utah 1991) .............................................................................................. 31

*C.R. England v. Swift Transp. Co.*,
2019 UT 8, 437 P.3d 343 ............................................................................................. 39

*Calsert v. Estate of Flores,*
  2020 UT App 102 12 , 470 P.3d 464 ............................................................................. 12

*Campbell Bldg. Co. v. State Road Comm'n,*
  70 P.2d 857 (Utah 1937) .............................................................................................. 50

*Campbell v. Pack,*
  15 Utah 2d 161, 389 P.2d 464 (1964) .......................................................................... 61

*Cannon v. Univ. of Chicago,*
  441 U.S. 677 (1979) ..................................................................................................... 14

*Colman v. Utah State Land Board,*
  795 P.2d 622 (Utah 1990) ........................................................................................ 51, 52

*Cox v. Hatch,*
  761 P.2d 556 (Utah 1988) ........................................................................................ 31, 34

*Croft v. Millard County Drainage Dist. No. 1,*
  202 P. 539 (Utah 1921) ................................................................................................ 52

*Davis v. California,*
  No. 17-2125, 2017 WL 4758928 (D. Kan. Oct. 20, 2017) ............................................. 10

Davis v. Utah,
  No. 20-4042, 2021 WL 3930277 (10th Cir. Sept. 2, 2021) ........................................... 48

*DeBry v. Godbe,*
  1999 UT 111, 992 P.2d 979 .......................................................................................... 31

*Dexter v. Bosko,*
  2008 UT 29, 184 P.3d 592 (Utah 2008) ....................................................................... 53

*Dodge v. Shoemaker,*
  695 F. Supp. 2d 1127 (D. Colo. 2010) .......................................................................... 43

*Eldridge v. Johndrow,*
  2015 UT 21, 345 P.3d 553 (cleaned up) ....................................................................... 37

*Ellefsen v. Roberts,*
  526 P.2d 912 (Utah 1974) ............................................................................................ 20

*Employees of Dept. of Public Health and Welfare of Missouri v. Department of Public Health*
  *and Welfare of Missouri,*
  411 U.S. 279 (1973) ..................................................................................................... 50

*Fausett v. Am. Res. Mgmt. Corp.,*
  542 F. Supp. 1234 (D. Utah 1982) ................................................................................ 40

*Fearing v. Bucher*
  *977 P.2d 1163 (Or.1999)* ............................................................................................. 24

*Ferguson v. Williams & Hunt, Inc.,*
  2009 UT 49, 221 P.3d 205 ................................................................................... 24, 25, 26

*Fester v. Farmer Bros. Co.,*
  49 F. Appx 785 (10th Cir. 2002) ................................................................................... 23

*Franco v. The Church of Jesus Christ of Latter-day Saints,*
  2001 UT 25, 21 P.3d 198 .............................................................................................. 42

*Gallagher v. Shelton,*
  587 F.3d 1063 (10th Cir. 2009) .................................................................................... 11

*Giusti v. Sterling Wentworth Corp.,*
　2009 UT 2; 201 P.3d 966 .................................................................................................. 38

*Gonzaga Univ. v. Doe,*
　536 U.S. 273 (2002) ......................................................................................................... 14

*Graves v. Utah Cnty. Gov't,*
　2024 UT App 80, 551 P.3d 1029 ........................................................................... 19, 29, 30

*Hall v. Bellmon,*
　935 F.2d 1106 (10th Cir. 1991) ....................................................................................... 26

*Harris v. Champion,*
　51 F.3d 901 (10th Cir. 1995) .......................................................................................... 43

*Heartwood Home Health & Hospice LLC v. Huber,*
　2020 UT App 13, 459 P.3d 1060 ..................................................................................... 39

*Henderson v. Glanz,*
　813 F.3d 938 (10th Cir. 2015) ........................................................................................ 45

*Hiatt v. Colo. Seminary,*
　858 F.3d 1307 (10th Cir. 2017) ...................................................................................... 13

*Holgers v. South Salt Lake PD*
　2011 WL 98488 (D. Utah Jan. 12, 2011)......................................................................... 32

*Jackson v. Birmingham Board of Education,*
　544 U.S. 167 (2005).......................................................................................................... 15

*Jacob v. Bezzant,*
　2009 UT 37 ............................................................................................................... 31, 36

*Jensen ex. rel. Jensen v. Cunningham,*
　2011 UT 17, 250 P.3d 465 (Utah 2011)........................................................................... 53

*Jensen v. Sawyers,*
　130 P.3d 325 (Utah 2005).......................................................................................... 30, 35

*Jensen v. W. Jordan City,*
　No. 2:12-CV-736-DAK, 2016 WL 4256946 (D. Utah Aug. 11, 2016)................................... 29

*Johnson v. Schnabel,*
　2023 UT App 102, 536 P.3d 1147 ................................................................................... 37

*Jones v. U.S. Child Support Recovery,*
　961 F. Supp. 1518 (D. Utah 1997).................................................................................. 36

*Joseph v. Board of Regents of the University System of Georgia,*
　121 F.4th 855 (11th Cir.2024) ............................................................................. 14, 15, 16

*Judd v. Drezga,*
　2004 UT 91, 103 P.3d 135............................................................................................ 56, 57

Kansas Penn Gaming, LLC v. Collins,
　656 F.3d 1210 (10th Cir. 2011) ...................................................................................... 46

*Keisel v. Westbrook,*
　2023 UT App 163, 542 P.3d 536 .................................................................................... 32

*Kuchcinski v. Box Elder County,*
　2019 UT 21 , 450 P.3d 1056 (Utah 2019)........................................................................ 53

*Leigh Furniture and Carpet Co. v. Isom,*
　657 P.2d 293 (Utah 1982).......................................................................................... 37, 38

*Lollis v. City of Eufaula,*
 249 Fed.Appx. 20 (10th Cir.2007).................................................................................. 40

*M.J. v. Wisan,*
 2016 UT 13, 371 P.3d 21 ............................................................................................... 20

*MacArthur v. San Juan County,*
 405 F. Supp. 2d 1302 (D. Utah 2005)............................................................................ 50

McDonald v. Wise,
 769 F.3d 1202 (10th Cir. 2014) ..................................................................................... 47

*Merida Delgado v. Gonzales,*
 428 F.3d 916 (10th Cir. 2005) ....................................................................................... 11

*Miller v. Utah,*
 638 F. App'x 707 (10th Cir. 2016)................................................................................. 29

*Minnis v. Oregon Mut. Ins. Co.,*
 334 Or. 191 (Or. 2002) .................................................................................................. 24

*Mitchell v. Forsyth,*
 472 U.S. 511 (1985)....................................................................................................... 44

*Moore v. Guthrie,*
 438 F.3d 1036 (10th Cir. 2006) ..................................................................................... 11

*Moss v. Pete Suazo Utah Athletic Comm'n,*
 2007 UT 99, , 175 P.3d 1042 ......................................................................................... 60

*Moulding Invs., LLC v. Box Elder Cnty.,*
 2024 UT App 23, 545 P.3d 781 ..................................................................................... 12

*Mullenix v. Luna,*
 136 S.Ct. 305 (2015)................................................................................................. 44, 45

*N. Haven Bd. of Educ. v. Bell,*
 456 U.S. 512 (1982)....................................................................................................... 15

*Nevares v. Adoptive Couple,*
 2016 UT 39, 384 P.3d 213 ............................................................................................. 13

*Normandy Apartments, Ltd. v. U.S. Dep't of Housing & Urban Dev.,*
 554 F.3d 1290 (10th Cir. 2009) ..................................................................................... 10

*Oakwood,*
 2004 UT 101 .................................................................................................................. 12

*Obendorfer v. Gitano Group, Inc.,*
 838 F. Supp. 950 (D. N.J. 1993).................................................................................... 38

O'Connor v. Burningham,
 2007 UT 58, 165 P.3d 1214............................................................................................ 33

*P.J. ex rel. Jensen v. State of Utah,*
 No. 2:05-cv-0739, 2006 WL 1702585 (D. Utah June 16, 2006) .............................. 53, 54

Pahls v. Thomas,
 718 F.3d 1210 (10th Cir. 2013) ................................................................................ 44, 46

*Parks v. Utah Transit Auth.,*
 2002 UT 55, 53 P.3d 473................................................................................................ 60

*Peak Alarm Co., Inc. v. Werner,*
 2013 UT 8, 297 P.3d 592................................................................................................ 18

*Pearson v. Callahan,*
555 U.S. 223 (2009)........................................................................................................ 45

*Peck v. State of Utah,*
2008 UT 39, 191 P.3d 4 ................................................................................................. 18

*Phillips v. JCM Development Corp.,*
*666 P.2d 876 (Utah 1983)* ............................................................................................ 23

*Pingree v. Univ. of Utah,*
No. 2:20-CV-00724-JNP-CMR, 2022 WL 1307902 (D. Utah May 2, 2022) ........ 19, 23, 29, 30

*PJ ex rel. Jensen v. Wagner,*
603 F.3d 1182 (10th Cir. 2010) ..................................................................................... 44

*Powell Indus., Inc. v. Allen,*
985 S.W.2d 455 (Tex. 1998)........................................................................................... 38

*Proctor & Gamble Co. v. Haugen,*
947 F. Supp. 1551 (D. Utah 1996)................................................................................. 41

*Reichle v. Howards,*
566 U.S. 658 (2012)........................................................................................................ 45

*Richards Irrigation Co. v. Karren,*
880 P.2d 6 (Utah Ct.App.1994) ..................................................................................... 59

*Riggins v. Goodman,*
572 F.3d 1101 (10th Cir. 2009) ..................................................................................... 45

*Ruiz v. McDonnell,*
299 F.3d 1173 (10th Cir. 2002) ..................................................................................... 10

*Salo v. Tyler,*
2018 UT 7, 417 P.3d 581 (quoting *Birkner* at 1057)........................................ 20, 22, 23

*Sampson v. Richins,*
*770 P.2d 998(Ut*ah Ct. App. 1989)............................................................................... 40

*Scott v. Universal Sales, Inc.,*
2015 UT 64, 356 P.3d 1172 ..................................................................................... 57, 59

*Segal v. Society*
*2012* WL 4930583 (N.D. Okla., Nov. 30, 2010) ......................................................... 38

*Six v. Henry,*
42 F.3d 582 (10th Cir.1994) ......................................................................................... 40

*Smith v. Delta Airlines, Inc.,*
2:07-CV-843, 2010 WL 2976075 (D. Utah, July 28, 2010)................................... 27, 38

*Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder County Sch. Dist.,*
2000 UT 87 20 & , 16 P.3d 533 (Utah 2000) ....................................... 50, 52, 53, 54

*St. Benedict's Dev. Co. v. St. Benedict's Hosp.,*
811 P.2d 194 (Utah 1991)............................................................................................. 38

*Standiford v. Salt Lake City Corp.,*
605 P.2d 1230 (Utah 1980)................................................................................. 58, 59, 61

Stidham v. Peace Officer Standards And Training,
265 F.3d 1144 (10th Cir. 2001) ................................................................................... 46

*Sussman v. Weber State Univ.,*
Case No. 2:16-cv-1119, 2017 WL 706191 (D. Utah Feb. 22, 2017)............................... 23, 30

*Tademy v. Union Pac. Corp.,*
  614 F.3d 1132 (10th Cir.2008) ............................................................... 39
*Tiede v. State,*
  915 P.2d 500 (Utah 1996) ...................................................................... 50
*Tindley v. Salt Lake City School Dist.,*
  2005 UT 30, 116 P.3d 295 (Utah 2005) ............................... 51, 60, 63, 64
*TruGreen Companies, L.L.C. v. Mower Brothers, Inc.,*
  199 P.3d 929 (2008) ............................................................................... 40
Truman v. Orem City,
  1 F.4th 1227 (10th Cir. 2021) ................................................................ 44
*Waite v. Utah Lab. Comm'n,*
  2017 UT 86, 416 P.3d 635 ........................................................ 55, 56, 57
*Watkins v. Gen. Refractories Co.,*
  805 F.Supp. 911 (D.Utah 1992) ............................................................ 37
*Watson v. Univ. of Utah Med. Ctr.,*
  75 F.3d 569 (10th Cir. 1996) ........................................................... 43, 51
*West v. Thomson Newspapers,*
  872 P.2d 999 (Utah 1994) ................................................................ 30, 31
*Wheeler v. McPherson,*
  2002 UT 16, 40 P.3d 632 ................................................................. 13, 17
*Wilkinson v. State,*
  134 P. 626 (Utah 1913) .......................................................................... 50
*Will v. Michigan Dept. of State Police,*
  *491 U.S. 58 (1989)* ................................................................................ 43
*Williams v. FedEx Corporate Services*, Case,
  No. 2:13–CV–37, 2013 WL 4500431 (D.Utah Aug. 21, 2013) ............... 37
*Woodcock v. Board of Educ.,*
  187 P. 181 (Utah 1920) ..................................................................... 61, 62
*Wright v. Univ. of Utah,*
  876 P.2d 380 (Utah Ct. App. 1994) ................................................... 61, 62
*Zachery Davey, et al., Plaintiffs, v. Devin Blood, et al., Defendants. Additional Party Names:*
  *Est. of Ted Claude Davey, State of Utah, Ted Cla*ude Davey,
  No. 2:23-CV-442-AMA, 2024 WL 3728072 (D. Utah Aug. 7, 2024) ......... 11, 49, 52

Statutes

42 U.S.C. § 1983 ................................................................................ passim
Utah Constitution Article I, Section 7 ................................................ 3, 52, 53, 54
Utah Constitution Article I, Section 11 ............................................... passim
Utah Constitution Article I, Section 22 ............................................... 51
Utah Code 53H-3-303(3)(a)(i)(A) ....................................................... 47
Utah Code § 53B-2-101 ....................................................................... 4
Utah Code § 63G-7-101 ....................................................................... 18, 29
Utah Code § 63G-7-101(2)(b) .............................................................. 18
Utah Code § 63G-7-201(1) ................................................................... 18

Utah Code § 63G-7-102(5)(a)-(c) ................................................................................... 19
Utah Code § 63G-7-301(2)(i) ......................................................................................... 30
Utah Code § 63G-7-201(4)(b) ........................................................................................ 30
Utah Code § 63–30–2(4)(a) and (b) (1993) .................................................................... 59
Utah Code § 68-3-1 (1996) ............................................................................................. 50
Utah Code § 63G-7-201(4) ............................................................................................. 30

Rules

Fed. R. Civ. P. 12……………………………………………………………………….10, 11, 12, 13

Other Authorities

57 Am.Jur.2d Municipal, County, School and State Tort Liability § 10 (2001) .......................... 49
Restatement (Second) of Torts § 568(2) (Am. L. Inst. 1977)........................................................ 30
Restatement (Second) of Torts § 652D cmt.a (1977) .................................................................... 37
Restatement (Second) of Torts § 774A.......................................................................................... 40
Restatement (Third) of Agency § 7.07(2)...................................................................................... 20
Suits Against Governments and Officers: Sovereign Immunity,77 HARV. L. REV. 1 (1963)…49

**SUMMARY OF THE ISSUES AND REQUEST FOR RELIEF**

Plaintiffs are two attorneys and the Title IX coordinator for Utah Tech University who bring claims arising from a prank perpetrated in November 2023, by then-president Richard "Biff" Williams who surreptitiously prepared a note along with an arrangement of vegetables to place on the doorstep of a vice president (Sharp) who had recently undergone a medical procedure. The note listed two members of the Office of General Counsel and the Title IX Coordinator, along with another person not employed by the University.

After receiving the note and vegetables, Sharp inquired around to ascertain the culprit. He inquired first of Williams himself, who denied his involvement, leading Sharp to continue his search over the next days. He asked the members of his UMAC team, none of whom took credit nor were able to verify who delivered the note. Days later, during a happenstance encounter with Jared Rasband, Senior Associate Counsel—whose name appears on the note—Sharp asked Rasband whether he was involved. Rasband reported the note to Becky Broadbent, General Counsel, and Hazel Sainsbury, Director of Equity Compliance and Title IX Coordinator. Broadbent filed a complaint with Executive Director of Human Resources, Travis Rosenberg on November 12, 2023.

The following Monday, Broadbent met with Williams to directly confront him about the note and Williams continued to deny his involvement, but attempted to assure Broadbent that she and the other Plaintiffs were "loved" and "part of the family". Williams also asked Broadbent if Rasband or Sainsbury would be interested in talking to Williams so he could offer them assurances that they were also "loved" and "part of the family". During or following this meeting, Williams informed White he was the perpetrator of the note. Immediately thereafter,

1

White notified Broadbent he had information relating to the note and encouraged Broadbent to list him as a witness.

On November 15, 2023, Executive Director Rosenberg began an HR investigation into the matter, which was ultimately handed over to the Utah Board of Higher Education as Williams was a University President at the time. As Sainsbury was the Title IX Coordinator at the time, she could not serve as the investigator in her own case. The University began a year-long process to thoroughly investigate and address these complaints.

Following these investigations, Plaintiffs filed suit and gave an interview to the media describing the allegations of the complaint. Additionally, USHE appointed Defendant Shane Smeed as President of Utah Tech. President Smeed subsequently terminated Broadbent and Rasband's employment based on their conflict of interest in suing their own client while they are representing that same client. While Broadbent was an at-will employee who was not entitled to any due process, Rasband was a career service employee entitled to notice and an opportunity to be heard, but has not alleged those facts in the complaint.

Based on these facts, Plaintiffs bring twenty-one causes of action against twenty-two named Defendants, running the gamut from discrimination under Title IX and Title VII to state law tort claims including defamation, false light, intentional interference with existing and prospective economic relations, and intentional infliction of emotional distress. Apparently recognizing the tort claims are barred by the Utah Governmental Immunity Act ("UGIA"), Plaintiffs also challenge the constitutionality of the UGIA under the Open Courts clause of the Utah Constitution.

2

Defendants hereby move to dismiss eleven of the twenty-one claims—specifically, the First, Tenth, Eleventh, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth and Twenty-First Causes of Action. The grounds for dismissal are as follows:

Plaintiffs' First Cause of Action against Utah Tech, alleging discrimination pursuant to Title IX cannot be maintained because there is no recognized private right of action under Title IX for discrimination in employment.

Plaintiffs' Tenth and Eleventh Causes of Action allege defamation and false light against Defendants Utah Tech, Madsen, Schmidt, Black, and Ulrich. However, each of these Defendants enjoy immunity from suit for these causes of action under the Utah Governmental Immunity Act ("UGIA").

Likewise, Plaintiffs' Thirteenth Cause of Action alleging tortious interference with plaintiffs' prospective economic relations against Defendants Utah Tech, White, Rosenberg, Black, Hall, Madsen, Schmidt and Ulrich and Plaintiffs' Fourteenth and Fifteenth Causes of Action alleging tortious interference with plaintiffs' existing economic relations and intentional infliction of emotional distress against Smeed, White, Rosenberg, Black, Hall, Madsen, Schmidt and Ulrich are also barred by the UGIA.

Plaintiffs' Sixteenth and Eighteenth Causes of Action allege that Defendant Utah Tech (and other state institutions) deprived Plaintiffs of protected property and liberty interests without due process in violation of 42 U.S.C. § 1983. However, Defendant Utah Tech cannot be sued under 42 U.S.C. § 1983 because the University is not a "person" as defined by 42 U.S.C. § 1983.

3

Similarly, Plaintiffs' Seventeenth and Nineteenth Causes of Action, which allege that Defendant Utah Tech (and other state institutions) deprived Plaintiffs of property and liberty interests without due process in violation of Article I, Section 7, of the Utah Constitution are also barred because Defendant Utah Tech, as an arm of the State of Utah, enjoys sovereign immunity from these claims.

Plaintiff's Twentieth Cause of Action alleges Broadbent and Rasband were terminated for exercising their free speech rights, but these employees were speaking on the very same issues the University employed them to advise on. An employee speaking pursuant to their official duties is not entitled to first amendment protection.

Finally, Plaintiffs' Twenty-First Cause of Action asks this Court to grant Plaintiffs declaratory relief by ruling that the UGIA violates Article I, Section 11, of the Utah Constitution. However, this request is in contravention to the relevant and precedential caselaw of the Utah Supreme Court and should therefore be denied.

## BACKGROUND FACTS[1]

1.      Defendant Utah Tech is an institution of higher education formed and existing under Utah Code § 53B-2-101, with its principal office located in St. George, State of Utah. Second Am. Compl. ¶ 5.

---

[1] The Background Facts contain factual allegations asserted within Plaintiffs' Second Amended Complaint that are considered true only for purposes of this Motion and, by stating them here, Defendants do not waive, and specifically preserve, their right to later deny that any facts so asserted actually support the allegations contained in the same.

4

2.      Defendant Courtney White was the University's Chief of Staff at the time he heard about and reported Williams' involvement in the prank. He served as Interim President of Utah Tech January 5, 2024 through May 1, 2025. *Id.* 12, , 72, 100.

3.      Defendant Travis Rosenberg was the Executive Director of Human Resources at Utah Tech at all times material to the facts of this case.  He was employed by Utah Tech from at least 2016 until 2025. *Id.* ¶ 14.

4.      Defendant Jyl Hall is the Director of Public Relations at Utah Tech and has been employed by Utah Tech since at least 2014. *Id.* ¶ 16.

5.      Defendant Jared Madsen is the Director of University Design and Branding at Utah Tech and has been employed by Utah Tech since at least 2014. *Id.* ¶ 16.

6.      Defendant Brooke Ulrich is Director of University Events and Promotions and has been employed by Utah Tech since 2021. *Id.* ¶ 18.

7.      Defendant Stacy Schmidt is Assistant Director of Public Relations at Utah Tech and has been employed by Utah Tech since at least 2019. *Id.* ¶ 19.

8.      Defendant Matt Black is a photographer and Videographer at Utah Tech and has been employed by Utah Tech since 2019. *Id.* ¶ 20.

9.      Hall, Madsen, Schmidt, and Ulrich at all times relevant to this case reported to Vice President Jordon Sharp. *Id.* ¶ 80.

10.     On November 8, 2023, then-President Richard "Biff" Williams left a display of an assortment of vegetables shaped as male gentilia (hereinafter the "display") on Vice President Sharp's doorstep, along with a note describing the largest, longest vegetable in the display as a

5

"zuweenie" as well as listing four authors: Becky Broadbent, Jared Rasband, Hazel Stansbury (sic) and a fourth author. Two of the purported authors' names were misspelled. *Id.* ¶ 71.

11.    Shortly after the delivery, Sharp phoned Williams and inquired whether Williams was the perpetrator of the prank, and also texted Williams a picture of the display, note, and video footage of the doorbell camera that captured the delivery. *Id.* ¶ 75.

12.    Williams denied having knowledge of or involvement in the prank. *Id.* ¶ 76.

13.    Sharp then called his close friend, Del Beatty, Vice President for Student Affairs, to inquire whether he made the delivery. Sharp texted photos of the display, note, and doorbell camera footage of the delivery to Beatty. *Id.* ¶ 78.

14.    Beatty denied any knowledge of or involvement in the prank/note. *Id.* ¶ 79.

15.    Sharp then sent a group chat to his eleven full-time UMAC team members with photos of the display, note, and doorbell camera footage of the delivery. *Id.* ¶ 80.

16.    Sharp inquired of the UMAC team members who made the delivery, to which several UMAC team members responded as follows:

> Madsen: "All Becky!!!"
> Black: "Please report Hazel to…Hazel"
> Ulrich: "I'm dying!!!!"
> Schmidt: "Most impressive zuweenie I've ever seen"

*Id.* ¶ 81.

17.    Hall did not participate in the text thread nor respond to Jordon Sharp's inquiry.

18.    The following day, November 9, 2023, Williams showed White a photo of the display/note he left at Sharp's house the night before. *Id.* ¶ 85.

19.     Two days after the delivery of the prank at the "Board of Trustees Business Meeting", Sharp showed pictures of the display/note to Henrie Walton, Assistant to the President for Government and Community Relations. *Id.* ¶ 87.

20.     Walton denied his involvement in the delivery. *Id.* ¶ 90.

21.     Following the business meeting, Sharp again shared photos of the display/note at a luncheon, during which Sharp saw Rasband and "beckoned" him to the table asking him about the prank. *Id.* ¶ 92.

22.     Sharp informed Rasband that he had already inquired of Williams, Beatty, and Sharp's entire UMAC team about the delivery. *Id.* ¶ 93.

23.     During this encounter, Rasband was shocked, embarrassed, and humiliated. Nevertheless, he still tried to make clear to this large group of Utah Tech cabinet members and directors that he and the other members of OGC and the Title IX Office had nothing to do with this offensive act and was not something they would ever do. *Id.* ¶ 94.

24.     Two days later, on November 10, 2023, Broadbent reported the incident to Travis Rosenberg, Human Resources Director. *Id.* ¶ 95.

25.     The following day, November 13, 2023, Broadbent met with Williams to discuss the prank without knowing Williams perpetrated the prank. *Id.* ¶ 96.

26.     During this meeting, Williams repeated/maintained his deception and did not reveal his role in the prank to Broadbent. *Id.* ¶¶ 98.

27.     Following the November 13, 2023 meeting with Broadbent, Williams informed White that Broadbent was upset about the dissemination of the display/note by Sharp and Beatty. *Id.* ¶ 100.

28.     On November 15, 2023, Rosenberg informed Broadbent by phone that a witness (White) had informed Rosenberg that Williams perpetrated the prank. Rosenberg asked to meet with Broadbent and Rasband that afternoon, and in their meeting, Rosenberg informed them that HR was now investigating the matter. *Id.* ¶ 105.

29.     Broadbent was placed on *paid* administrative leave on February 26, 2024. *Id.* ¶¶ 296.o., 304. A true copy of the letter placing her on leave is attached hereto as Exhibit 1.[2]

30.     Broadbent's *paid* administrative leave came after she reported to White that she was struggling to complete her normal required job duties and participate fully in the investigative process to the level she wished and after Broadbent stated multiple times that the current situation of her continuing to work was "untenable". In light of these concerns, Broadbent was placed on *paid* administrative leave and released her from all job duties "to allow [Broadbent] to step away from [her] duties and avoid exacerbating [her] concerns." Ex. 1.

31.     Plaintiffs' complaints were for discrimination directed at them and have nothing to do with the sexual harassment of students. Doc. 203, Second Am. Compl. ¶¶ 107-113.

32.     Plaintiffs allege Williams acted within his scope of employment as president of Utah Tech when he typed the note with Plaintiffs' names on it in the presidential residence and delivered the vulgar display and "zuweenie" note with Plaintiffs' names falsely ascribed to the front porch of VP Sharp. *Id.* ¶ 243.

---

[2] A party may append to their briefing any document that is central to the complaint whose authenticity is not in dispute.

33.    Plaintiffs also allege Williams further acted within the course and scope of his employment when he denied his involvement to Sharp immediately after making the November 8, 2023 delivery. *Id.* ¶ 244.

34.    According to Plaintiffs, Defendants White, Rosenberg, Madsen, Schmidt, Black, Ulrich, and Smeed tortiously interfered with their contract "in the following ways:"

    a.    Sharp, Madsen, Schmidt, Black, and Ulrich tortiously interfered with Plaintiffs contract when they defamed Plaintiffs with actual malice when they contributed knowingly false comments about Plaintiffs and supporting the false attribution of the obscene delivery to Sharp in the lewd November 8-9, 2023, UMAC Group Chat, in furtherance of the false, intentional, injurious, and unprivileged, publication of Williams' vulgar display delivery. *Id.* ¶ 296d.

    b.    Hall tortiously interfered with Plaintiffs' contract when she falsely described the content of UMAC group chat during Utah Tech's Title IX investigation, telling the investigator she would not provide the additional screenshots (which would have revealed to the investigator Sharp's and his UMAC team's comments, *see* Ex. C). Madsen and Schmidt were also deceitful to the investigator. *Id.* ¶ 296f.

    c.    Rosenberg tortiously interfered with Plaintiffs' contract when he lied to Williams about who had reported the November 8, 2023, vulgar display to him, forced Plaintiffs to file formal grievances rather than proceed with potential informal resolution, failed to hire external investigators initially to investigate Plaintiffs' complaints, failed to interview or speak with Plaintiffs regarding their initial complaints, proceeded to investigate and remained involved in the later

9

d. processing of Plaintiffs' complaints even though he stated to Mr. Rasband that at least some of Utah Tech's administrators could not be trusted. *Id.* ¶ 296j. White and Rosenberg tortiously interfered with Plaintiffs' contract inhibiting Plaintiffs' ability to fulfill their employment obligations to Utah Tech by placing and requiring Broadbent to remain on involuntary leave, declining to use Rasband in his capacity within the OGC and denying him any supervisory support even when requested as a supportive measure, and excluding Sainsbury from her responsibilities and opportunities while denying her proper supervisory support. *Id.* ¶ 275m.

35. Plaintiffs allege White and Rosenberg interfered with their economic relations by placing Ms. Broadbent on involuntary leave and excluded her from the University premises without providing her the opportunity to challenge or appeal the Notice of Paid Administrative Leave and without allowing the Interim Title IX Coordinator to provide other supportive measures in lieu of placing her on leave. *Id..* ¶ 296m.

36. Broadbent and Rasband further allege Smeed tortiously interfered with their economic relations when he terminated their employment in violation of their due process rights and in retaliation for engaging in protected activities. *Id..* ¶ 296o.

37. Following the complaints, Utah Tech hired an outside entity, Grand River Solutions, to conduct an investigation into Plaintiffs' complaints. *Id..* ¶ 163.

38. Defendant Smeed was selected as the new president of Defendant Utah Tech University, and he assumed office on or about May 1, 2025. *Id..* ¶ 166.

10

39.    On May 8, 2025, Smeed terminated the employment of the attorney plaintiffs, Broadbent and Rasband citing University Policy.  *Id.*. ¶ 167.

40.    Smeed communicated his decisions in letters to Broadbent and Rasband.  *Id.* ¶ 168.  True and correct copies of these letters are attached hereto as Exhibits 2 and 3.

41.    It is already a matter of record in this case that Plaintiffs made public statements to the media about the facts alleged in this complaint *prior* to Broadbent and Rasband's terminations.  ECF 60, Sealed Motion for Temporary Restraining Order.

## ARGUMENT

### I.    STANDARD OF REVIEW

Defendants seek dismissal pursuant to Fed. R. Civ. P. 8, 12(b)(1) and 12(b)(6) which, respectively, preclude claims that are inadequately pled, lack jurisdiction and fail to state a claim for which relief may be granted.

Fed. R. Civ. P. 12(b)(1) bars a court from hearing matters for "lack of subject-matter jurisdiction." Because the defense of sovereign immunity is a jurisdictional bar, Courts should address arguments for dismissal claiming sovereign immunity under Rule 12(b)(1).[3] Under Rule 12(b)(1) the party invoking federal jurisdiction bears the burden of proof.[4] Where sovereign immunity is raised a Plaintiff "must show that the State of Utah has waived its sovereign

---

[3] *Accord Normandy Apartments, Ltd. v. U.S. Dep't of Housing & Urban Dev.*, 554 F.3d 1290, 1295 (10th Cir. 2009) ("[t]he defense of sovereign immunity is jurisdictional in nature, depriving courts of subject-matter jurisdiction where applicable.") *also see Ruiz v. McDonnell*, 299 F.3d 1173, 1180–82 (10th Cir. 2002) (analyzing whether defendant was entitled to sovereign immunity under Rule 12(b)(1)); *Davis v. California*, No. 17-2125, 2017 WL 4758928, at *1 (D. Kan. Oct. 20, 2017) (construing defendant's Rule 12(b)(6) motion to dismiss based on sovereign immunity as an argument for dismissal under Rule 12(b)(1)), aff'd, 734 F. App'x 560 (10th Cir. 2018).
[4] *See Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005).

immunity for their claim" and a "Plaintiffs' failure to do so will result in the dismissal of their claim without prejudice for lack of jurisdiction."[5] Defendants maintain that this Court lacks jurisdiction to hear Plaintiffs' First, Tenth, Eleventh, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth and Twentieth Causes of Action.

Federal Rule of Civil Procedure 12(b)(6) provides that the Court may dismiss any claim that "fail[s] to state a claim upon which relief can be granted." When considering a motion to dismiss, the Court views the complaint in a light most favorable to the plaintiff.[6] Nevertheless, a claim must be dismissed if the complaint does not contain enough facts to make the claim "plausible on its face."[7] "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[8] Further, a complaint must allege "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action," and it must "raise a right to relief above the speculative level."[9] A complaint must give a defendant "fair notice of what the claim is . . . and the grounds upon which it rests."[10] In determining the adequacy of a targeted complaint, the court should engage in a two-part process.

[5] *Zachery Davey, et al., Plaintiffs, v. Devin Blood, et al., Defendants. Additional Party Names: Est. of Ted Claude Davey, State of Utah, Ted Claude Davey*, No. 2:23-CV-442-AMA, 2024 WL 3728072, at *3 (D. Utah Aug. 7, 2024).

[6] *See Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006).

[7] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[8] *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

[9] *Twombly*, 550 U.S. at 555.

[10] *Id.* (quotations and citation omitted) (alteration in original).

First, the court should begin by identifying allegations that, because they "are no more than conclusions, are not entitled to the assumption of truth."[11] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[12] Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[13] Next, after excluding conclusory assertions, the court then assumes the veracity of well-pleaded allegations and determines whether they plausibly give rise to an entitlement to relief.[14] Rule 12(b)(6) does not allow a plaintiff to file a complaint devoid of supporting facts as a vehicle to commence discovery on the off chance some facts might exist which could support a plausible claim.[15] Furthermore, "[t]he rules are clear that documents attached to a complaint are incorporated into the pleadings for purposes of judicial notice and are fair game for this court to consider in addition to the complaint's averments."[16] Additionally, "[i]n the rule 12(b)(6) context, courts are also permitted to consider documents referred to in the complaint or that are central to the complaint, as well as certain types of public records."[17] Furthermore, a district court can consider evidence outside the pleadings on a rule 12(b)(1) motion without converting it to a motion for summary judgment.[18] Under this standard, the

---

[11] *Iqbal*, 556 U.S. at 679.
[12] *Id.*
[13] *Id.* at 678.
[14] *Id.*
[15] *Twombly*, 550 U.S. at 555, 562-63.
[16] *Moulding Invs., LLC v. Box Elder Cnty.*, 2024 UT App 23, ¶ 25, 545 P.3d 781, 786 (quoting *Oakwood*, 2004 UT 101, at ¶ 10) (internal quotation marks omitted).
[17] *Id.* (quoting *Calsert v. Estate of Flores*, 2020 UT App 102, ¶ 12 n.4, 470 P.3d 464) (internal quotation marks omitted)).
[18] *Nevares v. Adoptive Couple*, 2016 UT 39, ¶ 25, 384 P.3d 213 (citing *Wheeler v. McPherson*, 2002 UT 16, ¶ 20, 40 P.3d 632 (stating that rule 12 "does not convert motions based on subsections (b)(1) through (5) ... into motions for summary judgment simply because they

Tenth, Eleventh, Thirteenth, Fourteenth, Fifteenth Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twentieth Causes of Action against Utah Tech, Smeed, White, Rosenberg, Black, Hall, Madsen, Schmidt, Ulrich, and Smeed and the Twentieth Cause of Action for declaratory relief contained in Plaintiffs' Second Amended Complaint fail to state a claim for which relief may be granted and should therefore be dismissed.

## II.    PLAINTIFFS' FIRST CAUSE OF ACTION FAILS TO STATE A CLAIM AS THERE IS NO RECOGNIZED PRIVATE RIGHT OF ACTION UNDER TITLE IX FOR DISCRIMINATION IN EMPLOYMENT.

Plaintiffs have failed to allege sufficient facts to support their Title IX discrimination claim against Utah Tech. While the Supreme Court has ruled that Title IX is enforceable in court through an implied private right of action, upheld Title IX regulations pertaining to employment discrimination, and allowed lawsuits brought by employees alleging retaliation, it has not squarely addressed whether ***employees*** of federally funded schools may bring lawsuits under Title IX alleging sex discrimination outside of the retaliation context. Further, though the Tenth Circuit has addressed the question of whether Title IX sex discrimination suits are precluded by Title VII, finding no preclusion,[19] the Tenth Circuit has not considered the issue in a framework focused instead on whether Title IX includes an implied right of action for employment discrimination in the first place. Defendants raise this issue now and urge this Court to follow the Eleventh Circuit's approach, as it is persuasive.

Specifically, in *Joseph v. Board of Regents of the University System of Georgia*, 121 F.4th 855 (11th Cir.2024), the Eleventh Circuit concluded that "Title IX does not provide

---

include some affirmative evidence relating to the basis for the motion." (omission in original) (citation omitted)).

[19] *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316–17 (10th Cir. 2017).

[individuals] a private right of action for sex discrimination in employment."[20] The Court observed that an express or implied private right of action to enforce federal law must be created by Congress; as such, the Court must determine whether Congress attempted to craft not just a right, but a specific remedy. Indeed, without a clear indication of congressional intent to create a cause of action, "courts may not create one, no matter how desirable [a cause of action] might be as a policy matter, or how compatible with the statute."[21]

As a law passed by Congress under the Spending Clause, Title IX's *express* remedial scheme provides for the withdrawal of federal funding in the event of a violation. As the Eleventh Circuit observed, however, the United States Supreme Court has determined that Title IX provides an *implied* private right of action for students who complain of sex discrimination.[22]  The Supreme Court has also found an implied private right of action for employees engaging in protected activity in connection with complaints about discrimination against students,[23] and has also found that Title IX prohibits discrimination against employees in addition to students.[24]

The Eleventh Circuit accepted that it "must honor" the implied rights of action that exist, but stressed that courts may not "expand their scope" unless "Congress unambiguously intended

---

[20] 121 F.4th at 860.

[21] *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) ("[U]nless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement." (alteration adopted) (citation and internal quotation marks omitted)).

[22] *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)(holding that female medical student who was denied admission to a medical school may pursue a private cause of action).

[23] *See Jackson v. Birmingham Board of Education*, 544 U.S. 167, 171 (2005)(holding that an employee has a private right of action for Title IX retaliation where he complained about sex discrimination involving students).

[24] *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982).

a right of action to cover more people or more situations than courts have yet recognized."[25] With that in mind, the Eleventh Circuit reasoned that neither *Cannon*, *North Haven*, nor *Jackson* directly "speak to whether Title IX created an implied private right of action for sex discrimination in employment."[26] Moreover, the Eleventh Circuit observed that the Supreme Court "has never extended the implied private right of action under Title IX to claims of sex discrimination for ***employees*** of educational institutions."[27] The Court then determined that as to that open question, there was no such right. The Court rested its decision on two primary factors.

First, the Court concluded that nothing in the actual text of Title IX, which refers to discrimination against participants in "any education program or activity," explicitly "indicates congressional intent to provide a private right of action to employees of educational institutions."[28]

Second, the Court noted that Title IX, which extended Title VI's protections against discrimination in federally funded programs to include sex in addition to race, color, and national origin, was passed within three months of the Equal Employment Opportunity Act of 1972, which extended Title VII's prohibition of employment discrimination to employees of educational institutions. The Court concluded that this proximity showed that Congress intended to "create a comprehensive antidiscrimination remedial scheme" for students and employees, and to "accomplish these goals through different remedies."[29] In other words, while Title IX thus contains an implied right of action for students, who would otherwise lack a statutory remedy to

---

[25] *Joseph v. Bd. of Regents*, 121 F.4th at 865.
[26] *Id.* at 867.
[27] *Id.* (emphasis added).
[28] *Id.* at 868.
[29] *Id.*

enforce their rights, the statute does not embrace one for employees. The Eleventh Circuit concluded that it was unlikely Congress intended the express right of action in Title VII and an implied right in Title IX to offer "overlapping remedies."[30] Given the complexity of Title VII's express remedial scheme, it would be "anomalous," in the Court's view, to interpret the implied right under Title IX to allow employees "immediate access to judicial remedies unburdened by any administrative procedures."[31] Further, given the Spending Clause authority for Title IX, the court viewed it as "dubious" that recipient schools would understand that they accepted damages liability for employment discrimination under Title IX when such claims are available expressly under Title VII.[32]

Here, Plaintiffs seek a remedy to discrimination and disparate treatment which solely concerns their employment, not any complaints relating to students. Doc. 203, Second Am. Compl. ¶ 190. Specifically, Plaintiffs allege that they were subject to unwelcome harassment and discrimination *by Utah Tech's leaders and administrators*, the harassment and discrimination was based on sex, and because of the severity and pervasiveness of the harassment and discrimination, the terms and conditions of Plaintiffs' employment was altered. *Id.*. ¶¶ 168 and 35-38, 41-46, 50, 71, 72-81 (emphasis added).

Notably, Plaintiffs' Second Amended Complaint is utterly devoid of any allegations involving discrimination or harassment involving *students* or access to educational programs. Plaintiffs are even further displaced from the traditional Title IX framework, as their allegations solely rest upon interactions with, and the conduct of, their co-workers at Utah Tech. Since all

---

[30] *Id.* at 869.
[31] *Id.*
[32] *Id.*

Plaintiffs sex-based discrimination claims only relate to employees, grievances about other employees and the workplace, and have nothing to do with the sexual harassment of students, this Court should dismiss Plaintiffs' Title IX discrimination claims on the grounds described above that there is no implied private right of action under Title IX to claims of sex discrimination for *employees* of educational institutions. For the same reason, Plaintiffs' Title IX retaliation claim also must fail, as there is no private right of action for strictly employment retaliation absent some student involvement.

III.   **PLAINTIFFS' TENTH, ELEVENTH, THIRTEENTH, FOURTEENTH AND FIFTEENTH CAUSES OF ACTION ARE BARRED BY THE UTAH GOVERNMENTAL IMMUNITY ACT.**

Plaintiffs' Tenth, Eleventh, Thirteenth, Fourteenth, and Fifteenth Causes of Action allege a bevy of common law tort claims including defamation  (against Defendants Utah Tech, Black, Madsen, Schmidt and Ulrich), false light (against Utah Tech) tortious interference with existing economic relations (against White, Rosenberg, Black, Hall, Madsen, Schmidt, Ulrich and Smeed), and tortious interference with prospective economic relations (against all Defendants) and intentional infliction of emotional distress (against Defendants Black, Schmidt and Ulrich).[33] Doc. 203 , Am. Compl. at ¶¶ 216-257, 273-308. However, each and every one of these causes of action are barred by the UGIA and should therefore be dismissed.

The UGIA (Utah Code § 63G-7-101, *et seq.*), is a "single, comprehensive chapter govern[ing] all claims against governmental entities or against their employees or agents arising out of the performance of the employee's duties."[34] The UGIA states that "[e]xcept as otherwise

---

[33] Pl. Compl. at ¶¶ 255-274, 288-308.
[34] *Peak Alarm Co., Inc. v. Werner*, 2013 UT 8, ¶ 16, 297 P.3d 592 (quoting Utah Code § 63G-7-101(2)(b)).

provided in this chapter, ***each governmental entity and each employee of a governmental entity are immune from suit for any injury that results from the exercise of a governmental function***."[35] As such, the UGIA grants general immunity from suits to governmental entities, and to employees of governmental entities, for actions arising out of the performance of the employee's duties. Utah courts apply a three-part test to determine whether a governmental entity is immune from suit under the UGIA: "(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver."[36] In the present matter, application of each of these three tests clearly establishes that Plaintiffs' Tenth, Eleventh, Thirteenth, Fourteenth, and Fifteenth Causes of Action are barred by the UGIA.

### A. Governmental Function

Under the first prong of the three-part test, the court asks whether the particular activity in question constitutes a governmental function. "Governmental function" is defined broadly as "each activity, undertaking, or operation of a governmental entity" or of "a department, agency, employee, agent, or officer of a governmental entity," as well as "a governmental entity's failure to act."[37] In short, "governmental function" as defined by the Utah legislature "encompass[es] anything the government decides to do."[38]

---

[35] Utah Code § 63G-7-201(1) (emphasis added).
[36] *Peck v. State of Utah*, 2008 UT 39, ¶ 8, 191 P.3d 4 (citing *Blackner v. Dep't of Transp.*, 2002 UT 44, ¶ 10, 48 P.3d 949).
[37] Utah Code § 63G-7-102(5)(a)-(c) (emphasis added); *accord Pingree v. Univ. of Utah,* No. 2:20-CV-00724-JNP-CMR, 2022 WL 1307902, at *2 (D. Utah May 2, 2022).
[38] *Graves v. Utah Cnty. Gov't,* 2024 UT App 80, ¶ 15, 551 P.3d 1029.

Here, Defendant Utah Tech is a governmental entity of the State of Utah and, at all times relevant hereto, Defendants Smeed, White, Rosenberg, Black, Hall, Madsen, Schmidt and Ulrich were employees of Utah Tech and, as will be shown in further detail below, were at all times acting solely within their capacity as employees of Utah Tech. Thus, any "activity, undertaking, or operation" performed by Defendants Utah Tech, Smeed, White, Rosenberg, Black, Hall, Madsen, Schmidt and Ulrich, whether as a governmental entity or as an employee, agent, or officer of a governmental entity, would qualify as a governmental function.

### B.  Waiver

### 1.  Immunity for Individual Government Employees

The UGIA affords broad immunity to individual government employees for acts performed within the scope of their employment. To determine if an employee's action is within the scope of their employment the Utah Supreme Court applies a test first set forth in *Birkner v. Salt Lake Cnty.*, 771 P.2d 1053, 1055 (Utah 1989).[39] Under the *Birkner* test, an employee's action is within the scope of employment if the action was (1) "of the general kind the employee is employed to perform," and (2) "motivated, at least in part, by the purpose of serving the employer's interest."[40] "Thus, an employee acts within the scope of employment when her acts are 'generally directed toward the accomplishment of objectives within the scope of the

---

[39] While the original test set forth in *Birkner* had three steps, the Utah Supreme Court would later clarify that, "contrary to our decision in *Birkner*, we hold that an agent need not be acting 'within the hours of the employee's work and the ordinary spatial boundaries of the employment' in order to be acting within the course of his employment." *M.J. v. Wisan*, 2016 UT 13, ¶ 59, 371 P.3d 21.

[40] *Birkner*, 771 P.2d at 1057.

employee's duties and authority, or reasonably incidental thereto.'"[41] Likewise, an employee acts within the scope of employment when "engaging in a course of conduct subject to the employer's control."[42] Indeed, "[t]he question is whether the worker is performing 'duties assigned by the employer, as opposed to being *wholly involved in a personal endeavor*.'"[43]

In the present instance, while Plaintiffs' Second Amended Complaint contains several allegations that are purely speculative and/or conclusory, [44] the allegations that are supported by some factual assertions clearly establish that any and all acts allegedly taken by Defendants White, Rosenberg, Black, Hall, Madsen, Schmidt, Ulrich and Smeed were performed solely within their capacity as employees of Defendant Utah Tech and were not a wholly personal endeavor.

### a. The UMAC Defendants

As alleged by Plaintiffs, the tort claims against Defendants Black, Hall, Madsen, Schmidt and Ulrich (hereinafter the "UMAC Defendants") for defamation, false light, tortious interference with existing economic relations, and intentional infliction of emotional distress, all stem from Williams' prank containing an attribution to Plaintiffs and one other person (albeit

---

[41] *Salo v. Tyler*, 2018 UT 7, ¶ 36, 417 P.3d 581 (quoting *Birkner* at 1057).

[42] *See* M.J. v. Wisan, 2016 Utah 13, ¶ 59, 371 P.3d 21, endorsing Restatement (Third) of Agency § 7.07(2) *13 ("An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control").

[43] *Id*. (quoting *Birkner* at 1057) (emphasis added).

[44] As relevant here, the allegations in ¶¶ 37, 48 112, 145, 146, 147, 149, 270, 297 and 310 of Plaintiffs' Second Amended Complaint are based solely on "information and belief." This includes Plaintiffs' contention in ¶¶ 297 & 310 that "Defendants were acting for purely personal reasons." Being conclusory and/or devoid of factual support, they therefore cannot be relied upon when determining the sufficiency of the pleading since the "sufficiency of [a] Plaintiffs' pleadings, which are construed together, *must be determined by the facts pleaded rather than the conclusions stated*." *Ellefsen v. Roberts*, 526 P.2d 912, 915 (Utah 1974) (emphasis added).

with some of their names misspelled), and then further disseminated by Sharp to other employees of Utah Tech, who then responded in various ways. *See e.g.* Doc. 203, Sec. Am. Compl. ¶¶ 241-280, 294-323. Regarding the prank, Plaintiff expressly alleges:

(1) "Williams *acted within his scope of employment* as president of Utah Tech when he typed the note with Plaintiffs' names on it in the presidential residence, and delivered the vulgar display and "zuweenie" note with Plaintiffs' names falsely ascribed to the front porch of VP Sharp." *Id.* ¶¶ 243, 265, , 243, 275 (emphasis added); and

(2) "Williams *further acted within the course and scope of his employment* when he denied his involvement to Sharp immediately after making the November 8, 2023 delivery when contacted about it by Sharp, which denial resulted in Sharp's dissemination of the vulgar display and "zuweenie" note which Williams ascribed to Plaintiffs." *Id.* ¶¶ 244, 266, 296a. (emphasis added).

Thus, by their own pleading, Plaintiffs impliedly concede that the prank and the events flowing therefrom are within the scope of the employment of the UMAC Defendants.

All the UMAC Defendants were full-time employees of the UMAC Team and therefore under VP Sharp's supervision. *Id.* ¶¶ 16-20, 33, 80-83, 93, 199, 247, 296c; Doc. 203 and 203-3. From the group chat, it is made clear that Sharp disseminated the note and "zuweenie" photo to the UMAC Defendants specifically to ascertain if any were responsible for the prank. Indeed, Sharp's group chat to the UMAC Defendants begins and ends with the following: "Who was this …?" and "Ok, someone fess up. Who's the mastermind of the Zuweenie?" Plaintiffs also allege that Sharp "informed Mr. Rasband that he had already inquired of Williams, Beatty, and *Sharp's entire UMAC team*, about the delivery." Doc. 203, Second Am. Compl. ¶ 93 (emphasis added).

Under such circumstances, the UMAC Defendants' chats qualify as a response to an employment-related inquiry—and are within the scope *and obligation* of their employment for

22

purposes of the UGIA.[45] Indeed, there can be no dispute that the actions between Sharp and the UMAC Defendants are fundamentally the same type of interaction that occurred between Sharp and Williams, which Plaintiffs state was within the scope of Williams' employment. The other alleged circumstances specifically involving Defendants Hall, Madsen and Schmidt are also squarely withing the scope of their employment, in that their actions were pursuant to a formal employer-initiated investigation into the prank. Doc. 203, Second Am. Compl. ¶¶ 84, 296f. The fact that the UMAC Defendants may have provided insensitive, unhelpful, or purportedly false/deceitful replies does not remove their actions from their scope of employment.[46] Indeed, Williams' response to Sharp—denying knowledge or involvement in the prank—ultimately turned out to be deceitful, and yet, Plaintiffs claim it was within the scope of his employment. Id. ¶¶ 243, 244, 265, 266, 296a.

Moreover, the UMAC Defendants did not engage in an independent course of action. None initiated the exchange and acted only in reply or response to a direct inquiry from their supervisor, and in the case of Defendants Hall, Schmidt and Madsen, also to a formal employer-initiated investigation. "[A]n employer is vicariously liable for an employee's intentional tort if

---

[45] *See e.g., Fester v. Farmer Bros. Co.*, 49 F. Appx 785, 797 (10th Cir. 2002) (unpublished) (finding division manager's statement was within scope of his employment because he led investigation that resulted in employee's discharge and notified employee of termination); *Pingree v. Univ. of Utah,* No. 2:20-CV-00724, 2022 WL 1307902, at *3 (D. Utah May 2, 2022)("When a supervisor—indeed, the organization's principal supervisor—requests input on a specific student's situation, providing that input is inherently a duty assigned by the employer.); *Sussman v. Weber State Univ.,* Case No. 2:16-cv-1119, 2017 WL 706191, at *4-*5 (D. Utah Feb. 22, 2017) (unpublished) (interpreting the GIAU to immunize defamatory statements made by university employees during an official staff meeting).

[46] It is well-established that a principal remains liable for the actions of their agent, even if specifically prohibited, if motivated in part for the principal's benefit. *See Phillips v. JCM Development Corp., 666 P.2d 876, 882 (Utah 1983)* (affirming trial verdict and respondeat superior liability despite evidence workplace rules prohibited the tortious conduct).

the employee's purpose in performing the acts was either wholly or only in part to further the employer's business, ***even if the employee was misguided in that respect***."[47] Likewise, even when there is no direct evidence a principal expressly instructed an agent to engage in an intentional tort, and the acts undisputedly violate the employer's policies and practices, if the "general kind" of conduct leading up to the injury is authorized, then it does not fall outside the scope of employment.[48] In short, the UMAC Defendants were responding to an employer-directed inquiry or investigation, and as such, were acting within the scope of their employment.

### b. Defendants Smeed, White and Rosenberg.

Defendants Smeed, White and Rosenberg were likewise acting within the scope of their employment as it regards Plaintiffs' claims against them for tortious interference with existing economic relations and tortious interference with prospective economic relations.  Indeed, Plaintiffs specifically allege at ¶ 306, "Williams, Smeed, Landward, Adams, and White were acting in the course and scope of their employment when they tortiously interfered with Plaintiffs' prospective economic relations."   Plaintiffs allege that Rosenberg tortiously interfered with Plaintiffs' contract when he lied to Williams about who had reported the prank, forced Plaintiffs to file formal grievances rather than proceed with potential informal resolution, failed

---

[47] *Aguila v. Planned Parenthood of Utah*, 2023 UT App 49, ¶ 21, 530 P.3d (emphasis added and cleaned up).

[48] *See Id.*; *Fearing v. Bucher*, 977 P.2d 1163, n.4 (Or.1999) ("[A]n employee's intentional tort rarely, if ever, will have been authorized expressly by the employer. In that context, then, it virtually always will be necessary to look to the acts that led to the injury to determine if those acts were within the scope of employment."); *Minnis v. Oregon Mut. Ins. Co.*, 334 Or. 191, 205 (Or. 2002) ("Employers do not ordinarily hire others for the specific purpose of committing intentional torts, and vicarious liability would be defeated in almost every instance under such a standard."). *Cf. Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 27, 221 P.3d 205 ("The conditional privilege also permits mistakes to be made; otherwise, there would be no need for the privilege.").

to hire external investigators initially to investigate Plaintiffs' complaints, failed to interview or speak with Plaintiffs regarding their initial complaints, proceeded to investigate, remained involved in the later processing of Plaintiffs' complaints even though he stated to Rasband that at least some of Utah Tech's administrators could not be trusted, and participated in placing Ms. Broadbent on leave. Doc. 203, Second Am. Compl. ¶¶ 109-111, 113-118, 123, 132, 136, 148, 296j. Plaintiffs further allege that White tortiously interfered with Plaintiffs' contracts by placing and requiring Broadbent to remain on *paid* administrative leave, declining to use Rasband in his capacity within the OGC and denying him any supervisory support even when requested as a supportive measure, and excluding Sainsbury from her responsibilities and opportunities while denying her proper supervisory support. *Id.* ¶¶ 86, 132, 134, 296m, 296n.. Plaintiffs' intentional infliction of emotional distress claims against Rosenberg and White are based on allegations regarding Broadbent's placement on *paid* administrative leave, failure to provide supportive measures, and the contention that the manner in which Broadbent was escorted off of campus on February 26, 2024 was humiliating and disruptive, *Id.*

First, regardless of the veracity (or lack thereof) of Plaintiffs' allegations, neither White, Smeed nor Rosenberg could have taken any of the actions that Plaintiffs allege they took, or should have taken but failed to take, absent their authority to do so under their respective employment positions. Rosenberg is the Executive Director of Human Resources at Utah Tech, and the very person to whom Broadbent alleges she went, on behalf of herself and her co-Plaintiffs, Sainsbury and Rasband, to lodge her complaints about the prank and administration; Rosenberg is also the person with whom Broadbent and Rasband met as a follow-up to Broadbent's initial report, and the person to whom White reported his knowledge that Williams

25

was the perpetrator of the prank. Doc. 203, Second Am. Compl. ¶¶ 14, 95, 105, 107, 108, 109. White was the University's Chief of Staff at the time he heard about and reported Williams' involvement in the prank and has been the Interim President since former President Williams departure, including when White placed Broadbent on paid administrative leave and released her from all job duties "to allow [Broadbent] to step away from [her] duties and avoid exacerbating [her] concerns." Ex. 1; Second Am. Compl. ¶132. Rosenberg and White's purported actions fit squarely within the description of being generally directed toward the accomplishment of objectives within the scope of each of these Defendants' duties and authority, or reasonably incidental thereto—such interests being the reporting and/or processing of employee complaints against the University and its administrators, position management, and personnel administration. Plaintiffs cannot overcome this fact through conclusory and unsupported assertions that Rosenberg and White acted for a purely personal reasons or with willful misconduct. *Id.* ¶¶ 297, 310. "[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."[49] Indeed, "the court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations."[50] Here, Plaintiffs have not alleged any facts to show that the actions of Rosenberg or White were "in no way connected with [Utah Tech's] interests."[51] Nor have Plaintiffs pled facts to show that Rosenberg or White acted, or failed to act, without just cause or excuse, and with an awareness that their acts will probably result in injury.[52]

---

[49] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).
[50] *Id.*
[51] *See Smith v. Delta Airlines, Inc.,* 2:07-CV-843, 2010 WL 2976075, *2 (D. Utah, July 28, 2010).
[52] *See* Utah Code 63G-7-102(13).

### c. Smeed

Defendant Shane Smeed was not employed by Utah Tech until May 1, 2025 and had no participation in any of the events preceding his tenure.  Second Am. Compl., ¶¶23, 166-169.  At several points in the Second Amended Complaint, Plaintiffs allege Smeed was acting, "in the course and scope of [his] employment" (¶ 306) or "under color of state law" (¶ 330, 340, 352).  Notably at ¶ 306, Plaintiffs offer no description of Smeed's allegedly tortious acts other than through a general incorporation by reference.  Further, the only events he is alleged to be involved in—the terminations—were clearly official acts.  They were communicated over Smeed's signature as "University President", on University letterhead, and pursuant to University Policy applicable to terminations as outlined in the letters. Second Am. Compl. ¶¶ 173-184, Exhibits 2 and 3.  Plaintiffs do not allege Smeed had any other interactions during the short time they worked together before the terminations were issued and assert no basis for any tort claims against Smeed other than those arising from the terminations.  The entirety of Plaintiffs' claims against Smeed arise from his acts as president of the university and are categorically pursuant to his official duties.

Although the thirteenth cause of action for tortious interference with existing economic relations is asserted by "All Plaintiffs against Defendants…Smeed…", there are no specific allegations connecting this tort as asserted by Sainsbury against Smeed.  Second Am. Compl., ¶¶ 294-303.  The thirteenth cause of action is stated without any factual basis to support a claim by Sainsbury against Smeed and must be dismissed.

The fourteenth cause of action for tortious interference with prospective economic relations suffers from the same defect and likewise must be dismissed.  Second Am. Compl. ¶¶ 304-315.

### C.  Interference With Prospective Economic Relations Against All Defendants.

As regards Plaintiffs' claim of intentional interference with prospective economic relations, the allegations are bare.

Indeed, Plaintiffs do not identify any specific actions on the part of the UMAC Defendants, Smeed, Rosenberg or White, other than those already alleged above, and then, Plaintiffs do so only by incorporation. Thus, the result is the same. All acts allegedly taken by such Defendants were performed solely within their capacity as employees of Utah Tech and were not a wholly personal endeavor.

Therefore, the facts of this matter, as detailed by Plaintiffs in their Amended Complaint, conclusively establish that any alleged actions taken by Individual Defendants Smeed, White, Rosenberg, Black, Hall, Madsen, Schmidt and Ulrich (and vicariously, by Utah Tech) that are relevant to, or associated with, the present litigation were undertaken solely within the scope of their employment with Utah Tech.

### D.  The UGIA Contains No Waiver for Intentional Torts including Defamation, False Light, and Intentional Interference with Existing and Prospective Economic Relations.

As indicated above, pursuant to Utah Code §§ 63G-7-101, *et seq*., employees of a governmental entity are immune from suit for any injury that results from the exercise of a governmental function unless such immunity is ***expressly waived*** thereunder.  However, Utah

Code §§ 63G-7-101, *et seq.*, contains no waiver, express or otherwise, of governmental immunity for injuries resulting from intentional torts.[53]

This is fatal to Plaintiffs' claims against Defendants Utah Tech, Smeed, White, Rosenberg, Black, Hall, Madsen, Schmidt and Ulrich, under Plaintiffs' Thirteenth, Fourteenth, and Fifteenth Causes of Action for tortious interference with existing and prospective economic relations and for intentional infliction of emotional distress as these are intentional torts for which immunity has not been waived and, therefore, these causes of action should be dismissed. Similarly, to the extent that Plaintiffs claim that the conduct which they allege gave rise to their Tenth and Eleventh Causes of Action, alleging defamation and false light, was intentional, these claims should also be dismissed for the same reason.

### E. Exceptions to UGIA's Waiver of Immunity for State-Law Tort Claims Based in Negligence.

While it contains no waiver for intentional torts, the UGIA has expressly waived immunity "as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment."[54]  However, § 63G-7-201(4) of the Utah Code provides a series of exceptions to this general negligence immunity waiver, including an

---

[53] *See Graves v. Utah Cnty. Gov't*, 2024 UT App 80, ¶ 21, 551 P.3d 1029 ("[I]t does not follow that the State has waived its immunity for the intentional torts …. [T]he UGIA makes clear that governmental entities and their employees are immune from suit *unless immunity is expressly waived*.") (emphasis added); *accord Miller v. Utah*, 638 F. App'x 707, 715 (10th Cir. 2016) ("There are no provisions in the [UGIA] waiving immunity for intentional torts …. *") and Jensen v. W. Jordan City*, No. 2:12-CV-736-DAK, 2016 WL 4256946, at *12 (D. Utah Aug. 11, 2016); *and see Atiya v. Salt Lake Cnty.*, 852 P.2d 1007, 1011-12 (Utah App. 1993) (waiver of immunity under the UGIA does not include intentional torts; claims for intentional acts are barred); *Pingree,* 2022 WL 1307902, at *4 ("The court determines that the UGIA does not waive immunity for claims of defamation or interference with business relations....The UGIA does not contain any provision waiving immunity for intentional torts.") (citation omitted).
[54] Utah Code § 63G-7-301(2)(i).

exception for "any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment, if the injury arises out of or in connection with, or results from ... libel [or] slander."[55] This exception is applicable to the present matter and serves to preclude Plaintiffs' Tenth and Eleventh Causes of Action against Utah Tech, Black, Hall, Madsen, Schmidt and Ulrich. More specifically, while an injury arising from defamation and/or false light is not listed as an explicit exception, the explicit exceptions to the waiver do include libel and slander and "'defamation' encompasses both libel and slander."[56] Likewise, "the UGIA contains no waiver of immunity applicable to … claims for false light invasion of privacy."[57] Because the State of Utah, through the UGIA, has expressly retained immunity from suits alleging defamation and false light, Plaintiffs' Tenth and Eleventh Causes of Action are barred and should be dismissed.

IV.    **PLAINTIFFS' TENTH, ELEVENTH, THIRTEENTH, FOURTEENTH AND FIFTEENTH CAUSES OF ACTION SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ON THEIR MERITS.**

A.  **Plaintiffs' Tenth Cause of Action for Defamation Should be Dismissed.**

Plaintiff's defamation claim (Tenth Cause of Action) against Utah Tech and the UMAC Defendants must be dismissed because it does not state a plausible claim for defamation. To

---

[55] *Id*. at § 63G-7-201(4)(b).

[56] *See West v. Thomson Newspapers*, 872 P.2d 999, 1007 n.12 (Utah 1994); *also see Jensen v. Sawyers*, 130 P.3d 325, 332 n.6 (Utah 2005) ("Libel consists of the publication of defamatory matter by written or printed words....") (quoting Restatement (Second) of Torts § 568(2) (Am. L. Inst. 1977)); *Sussman v. Weber State Univ.*, No. 2:16-CV-1119-TC, 2017 WL 706191, at *5 (D. Utah Feb. 22, 2017) (holding that "[t]he State has not waived immunity from defamation suits" and citing to "libel [and] slander" listed in Utah Code § 63G-7-201(4)(b) as evidence); *and see Pingree,* CV 2022 WL 1307902, at *4-5 (holding that "[w]hile an injury arising from defamation is not listed as an explicit exception to the negligence immunity waiver, the exceptions include libel and slander. And 'defamation' encompasses both libel and slander.") (quotations omitted).

[57] *Graves* 2024 UT App 80 at ¶ 19.

prevail on a defamation claim, Plaintiff must state facts to show that the defendant made statements that (1) were false, (2) defamatory, (3) not subject to any privilege, (4) published to a third party with the requisite degree of fault, and (5) caused damages.[58] A statement alleged to be defamatory must have been more than just false, "nettlesome or embarrassing."[59] Rather, the alleged communication must impeach an individual's honesty, integrity, virtue, or reputation or his or her natural defects or expose him or her to public hatred, contempt, or ridicule."[60] Further, the alleged statement must be objectively verifiable as true or false.[61] Statements of opinion do not give rise to a defamation claim.[62] And truth is an absolute defense.[63]

Plaintiff's allegations fail to meet this burden.[64] Even construing the Second Amended Complaint liberally, there are only five alleged statements that Plaintiffs identify as made by the UMAC Defendants. None state a plausible claim for defamation.  By extension, even if Plaintiffs' theory of respondent superior liability could attach liability to Utah Tech, if the claims against the underlying individuals are dismissed, the claim against Utah Tech must likewise be dismissed.

In Utah, merely embarrassing statements are not enough to establish defamation. "At its core, an action for defamation is intended to protect an individual's interest in maintaining a good

---

[58] *West v. Thomson Newspapers*, 872 P.2d 999, 1007-08 (Utah 1994); *DeBry v. Godbe*, 1999 UT 111, 992 P.2d 979, 985.

[59] *Cox v. Hatch*, 761 P.2d 556, 561-62 (Utah 1988).

[60] *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994).

[61] *Jacob v. Bezzant*, 2009 UT 37, 212, ¶ 22, P.3d 535, 544.

[62] *Id.*

[63] *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 57 (Utah 1991).

[64] *Holgers v. South Salt Lake City*, 2:10 CV 532 TS, 2011 WL 98488, *3 (D. Utah Jan. 12, 2011) (unpublished) (an individual cause of action that does not state how the factual allegations fit in with the individual causes of action must be dismissed).

reputation. A publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff. A plaintiff must establish that the statement at issue is more than sharp criticism, that it instead damaged the plaintiff's reputation ... in the eyes of at least a substantial and respectable minority of its audience."[65]

Plaintiffs allege at paragraph 224, "Defendants … defamed Plaintiffs with actual malice when they contributed knowingly false comments about Plaintiffs *and supporting the false attribution of the obscene delivery*. (emphasis added).  This is a conclusory statement, offering no explanation for how that could be.

As to the remaining UMAC Defendants—Madsen, Black, Ulrich, and Schmidt—who did make statements, "because the existence of defamatory content is a matter of law, a reviewing court can, and must, conduct a context-driven assessment of each alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation." [66] This is not to say that the responsibility of determining whether a statement *is* defamatory as a matter of law falls to the reviewing court. In the first instance, it does not. Rather, the reviewing court must answer the question of defamatory ***susceptibility*** as a matter of law in a non-deferential manner. This court reviews the alleged statements in a "context-driven analysis" looking at whether the statements are susceptible to a defamatory meaning. Here, they are not.

First, Plaintiffs' allegations belie that the statements made by the UMAC Defendants were known to be untruthful to each Defendant. Plaintiffs allege that Williams authored the note

---

[65] *Keisel v. Westbrook*, 2023 UT App 163, ¶ 33, 542 P.3d 536, 547–48, cert. denied, 554 P.3d 1097 (Utah 2024).
[66] *O'Connor v. Burningham*, 2007 UT 58, ¶ 26, 165 P.3d 1214, 1222.

in the President's residence on or about November 8, 2023 and that his involvement was hidden from all (but White) until November 13, when after Williams repeated his "deceit" to Broadbent during a meeting, Williams immediately informed White that Broadbent was upset about the dissemination of the display/note. Doc. 203, Am. Compl. ¶¶ 100-101. It was purportedly only after this exchange that White informed Rosenberg, who then informed Broadbent on November 15 that Williams was the perpetrator of the prank. *Id.* ¶ 105. Notably, Plaintiffs do not allege that any of the UMAC defendants had any knowledge of the actual author of the note before they made their statements on November 8, the same evening of the delivery of the display/note. *Id.* ¶¶ 82-83. Nor can they. Again, this is because, as alleged, Williams not only denied his involvement to Sharp when Sharp called Williams immediately after delivery of the prank, *Id.* ¶¶ 77-78, 219-221, but Williams then further concealed his role in the authorship of the note from Sharp, the UMAC Defendants, and the University until November 13—five days after the allegedly defamatory statements by the UMAC Defendants.

Second, even if Plaintiffs could prove the UMAC defendants had knowledge their statements were false, the statements themselves are not capable of defamatory meaning—a threshold legal question to be decided by the court and which may not rest solely on conclusory allegations.[67] The statements by the UMAC defendants are alleged in paragraph 81:

> Madsen: All Becky!!
> Black: Please report Hazel to…Hazel
> Ulrich: I'm dying
> Schmidt: Most impressive zuweenie I've ever seen!"

---

[67] *See Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988)

33

Plaintiffs do not allege precisely *how* these statements are defamatory. The statements by Schimdt and Ulrich do not even mention Plaintiffs and thus cannot be defamatory as to them. Black's statement juxtaposing the purported "Hazel" from the note with the real "Hazel" likewise cannot be inferred to repeat the claim that Plaintiffs were the genuine authors of the note. Finally, the first statement "All Becky!!" is not subject to objective verification. The word "all" has multiple meanings and uses. The form used here is a common way to use "all" sarcastically, highlighting the irony in the situation by drawing attention to the unrealistic nature of the statement.

In context, the statements were in response to an employment inquiry from their supervisor, Sharp, who asked of his staff whether anyone knew who had made the delivery. The only information alleged to be known by the UMAC defendants is what was included in the note itself. The statements relating to Broadbent and Sainsbury (Hazel) may be insensitive, but are clearly sarcastic in context and thus not statements of genuine belief.  Indeed, even after his exchange with the UMAC Defendants, Sharp still asked the group to identify who the actual perpetrators were, meaning the listener (Sharp) did not infer any defamatory meaning as to Plaintiffs as he did not believe the prank to have been perpetrated by Plaintiffs. Sharp also continued to make similar inquiries of others that evening and over the next couple of days.  Doc 203, Second Am. Compl, ¶¶ 75, 78, 85, 87, 90-92. Thus, reaffirming his and the UMAC Defendants' disbelief in Plaintiffs' authorship of the display/note.

In short, no reasonable reader would have read any of these statements as an assertion of fact or belief, especially in context. The statements are not defamatory, and therefore, the

34

defamation claim against the UMAC Defendants (and vicariously Utah Tech) should be dismissed.

### B.  Plaintiffs' Eleventh Cause of Action for False Light Should Be Dismissed.

In Utah, "an actionable portrayal of a person in a false light may or may not include the communication of defamatory information about the victim. As the examples in the Restatement illustrate, a person may conceivably be placed in a false light through the dissemination of praiseworthy but untrue information about that person, if a reasonable person would find the information highly objectionable" [68] Nonetheless, to state a claim for false light, a plaintiff's allegations still must "demonstrate that (1) the defendant publicized a matter concerning the plaintiff that placed the plaintiff before the public in a false light, (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (3) the defendant knew or recklessly disregarded the falsity of the publicized matter and the false light in which the plaintiff was placed."[69] Here, Plaintiffs allegations fall short.

Plaintiffs allege the UMAC Defendants placed Plaintiffs in a false light when they *contributed knowingly false comments* about Plaintiffs and *supporting the false attribution* of the obscene delivery to Sharp in the lewd UMAC group chat. Doc 203, Second Am. Compl. ¶ 248. However, as already discussed above, Plaintiffs cannot prove the UMAC Defendants "knowingly" contributed false comments about Plaintiffs. The Second Amended Complaint alleges the note was authored by Williams who was also responsible for its delivery on November 8, and the continued misdirection following its receipt. Williams also expressly

---

[68] *Jensen v. Sawyers*, 2005 UT 81, ¶ 46, 130 P.3d 325, 334.
[69] Jacob v. Bezzant, 212 P.3d 535, 544 (Utah 2009).

denied being involved in the prank when questioned by Sharp on November 8, which was the same day Sharp sent the group chat and the UMAC Defendants responded. Moreover, five days after the note was delivered, Williams was still attempting to conceal his true identity as the author of the display/note further illustrating the UMAC Defendants could not have plausibly known at the time they made their statements who actually sent the display/note, and thus, could only have been expressing a belief or opinion.

Additionally, Plaintiffs cannot satisfy the "publicity" requirement as it relates to the UMAC Defendants' statements. The ***publicity*** required for a false light claim is different from the ***publication*** required for defamation.[70] For false light, "publicity" means the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. Examples would include newspapers, magazines, handbills to a large number of people or a statement made to a large audience. Stated another way, "the tort is concerned with communication that reaches the public and it is not satisfied when the disclosure is made only to a small group."[71] As regards the UMAC Defendants, Plaintiffs allege precisely a small-group disclosure—only employees on the group chat as the audience for their statements, not "the public at large."

Accordingly, for both these reasons, Plaintiffs' false light claim against the UMAC Defendants must be dismissed.

---

[70] *See Jones v. U.S. Child Support Recovery*, 961 F. Supp. 1518, 1521 (D. Utah 1997).
[71] *Williams v. FedEx Corporate Services*, Case No. 2:13–CV–37, 2013 WL 4500431, at *5 (D.Utah Aug. 21, 2013)( dismissing false light claim where the plaintiff alleged that a statement that he failed the defendant employer's drug test was made only to the plaintiff's fellow employees); *see also Watkins v. Gen. Refractories Co.*, 805 F.Supp. 911, 918 (D.Utah 1992) (quoting Restatement (Second) of Torts § 652D cmt. A (1977).

### C. Plaintiffs' Thirteenth Cause of Action for Tortious Interference With Existing Economic Relations Should Be Dismissed.

Plaintiffs' intentional interference with existing economic relations claim (Thirteenth Cause of Action) is subject to dismissal because, as previously addressed, Plaintiffs have not alleged that Smeed, White, Rosenberg or the UMAC Defendants were acting outside of the scope of their employment. Intentional interference requires a showing "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff."[72]

One party to a contract cannot be liable for the tort of intentional interference for inducing a breach by itself or by the other contracting party.[73] Rather, to recover damages for intentional interference with a contract, a plaintiff must allege conduct that intentionally and improperly interferes with the performance of a contract between another and a third person by inducing the third person not to perform.[74] When an employee is acting on behalf of his or her employer, that employee has carried out a corporate act and has not interfered with the employer's contract.[75]

Further, Utah courts hold that in order for an employee to be liable for intentional interference with business relationships, the employee must have been acting solely for personal

---

[72] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (cleaned up); *Johnson v. Schnabel,* 2023 UT App 102, ¶ 28, 536 P.3d 1147, 1154.

[73] *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982).

[74] *Id.*; *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991).

[75] *See e.g., Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 457 (Tex. 1998) ("Because a corporate officer's acts on the corporations behalf usually are deemed corporate acts, a plaintiff must show that the agent acted solely in his own interest.").

gain.[76] This standard also applies to claims for intentional interference with contract.[77] Here, Plaintiffs have not pled any facts that would support an allegation that any of the Defendants were acting purely for their own personal interests and not, at least in part, for their employer Utah Tech. Plaintiffs also cannot meet the improper purpose prong. The allegations against the UMAC Defendants arise either from an inquiry from their supervisor or from a formal investigation sanctioned by Utah Tech. In that context, the UMAC Defendants' actions were within the authorized scope **and obligation** of their employment. Defendants were also acting as agents of the University, and there is no "third person."  Put differently, "a person is not liable for intentional interference where the person engaged only in conduct in which he or she was legally entitled to engage."[78]  Applied here, the administrative leave, and ultimately the termination of Broadbent and Rasband's employment are alleged to be done by White and Smeed "acting in the course and scope of their employment" and pursuant to university policy. Doc 203, Second Am. Compl. ¶ 173.

---

[76] *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 65; 201 P.3d 966, 979; *Smith v. Delta Airlines, Inc.*, 2:07-CV-843 DAK, 2010 WL 2976075, *2 (D. Utah, July 28, 2010).

[77] *See, e.g., Ameen v. Merck & Co.*, 226 Fed. Appx. 363, 372 (5th Cir. 2007) (recognizing employee cannot interfere with employer's contract with another employee unless he acted solely for personal gain); *Taverna v. First Wave, Inc.*, 2010-CV-129 CVE FHM, 2012 WL 4930583, * 14 (N.D. Okla., Nov. 30, 2010) (unpublished) (holding no claim for tortious interference with employment contract against supervisor where there was no evidence supervisor was acting outside the scope of employment); *Obendorfer v. Gitano Group, Inc.*, 838 F. Supp. 950, 956 (D. N.J. 1993) (dismissing claim for intentional interference with employment contract because supervisor was acting on company's behalf). Employees act for purely personal motives when their actions are "in no way connected with the employer's interests." *Smith*, 2010 WL 2976075, *2.

[78] *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 44, 437 P.3d 343; *accord Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 32, 459 P.3d 1060.

As for Plaintiffs' claims that White and Rosenberg interfered with their contract by denying them "supervisory support", they are conclusory and without factual support.  Further, these assertions rest on the idea that they, or any employee, had a right to a specific supervisor—for which Plaintiffs have offered no authority—and that Broadbent's leave is unlawful, despite the clear law that administrative leave *with pay* is a recognized and accepted way of dealing with workplace investigations and personnel administration,[79] particularly when the aim is to permit an employee who finds the current situation of her continuing to work as "untenable" to step away from such duties to "avoid exacerbating [her] concerns". *See* Ex. 1.

Plaintiffs have also failed to state a claim for intentional interference with contract because, even if the allegations in the Second Amended Complaint are taken as true, they have not alleged actual interference that has resulted in a pecuniary loss, which is a necessary element in claims of tortious interference with existing or prospective economic relations as it forms the basis for the damages recoverable under such claims.[80]

In short, Plaintiffs have not pled the elements for tortious interference with economic relations, and as such, that cause of action should be dismissed.

---

[79] *Benavides v. City of Oklahoma City*, 508 F. App'x 720, 724 (10th Cir. 2013) ("'A stoppage of harassment' suggests a reasonable employer response.") quoting *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1148 (10th Cir.2008).

[80] *See TruGreen Companies, L.L.C. v. Mower Brothers, Inc.*, 199 P.3d 929 (2008)(highlighting the necessity of showing actual financial harm resulting from the interference); *Sampson v. Richins*, 770 P.2d 998, 1006-7(Utah Ct. App. 1989)(same). This also aligns with the Restatement (Second) of Torts § 774A, which has been adopted by Utah, and specifies that damages for intentional interference include the pecuniary loss of the benefits of the contract or prospective relation, consequential losses for which the interference is the legal cause, and emotional distress or harm to reputation if reasonably expected to result from the interference.

Case 4:24-cv-00091-DN-PK    Document 227    Filed 06/19/26    PageID.2964    Page 51 of 81

### D. Plaintiff's Fourteenth Cause of Action for Intentional Interference With Prospective Economic Relations Should Be Dismissed.

Here, Plaintiffs' allegations are again bare. Fatally, Plaintiffs have identified no facts showing that any statements, or actions, by White, Rosenberg, or the UMAC Defendants have been publicized outside of Utah Tech. Communications between employees of the entity, which is all that is specifically alleged, do not qualify.[81] The only publications in this case have been by Plaintiffs themselves by virtue of filing their complaint herein and by agreeing to a Q&A with the Salt Lake Tribune that they then published in the media. Thus, there can be no interference where there is no communication on the part of Defendants to a potential prospective employer.

Likewise, the Amended Complaint is devoid of any factual allegations identifying a potential prospective employer that Plaintiffs have even attempted to seek employment such that it would link purported wrongful conduct of Defendants with any realized damage. Stated another way, Plaintiffs have not tied their loss of a particular economic opportunity to a particular publication by a particular Defendant. Rather, Plaintiffs only allege in a general and conclusory manner that "Defendants" purported improper actions "have frustrated and stymied Plaintiffs' ability to find alternative employment in their industry and have made seeking other

---

[81] *See Fausett v. Am. Res. Mgmt. Corp.*, 542 F. Supp. 1234, 1242 (D. Utah 1982)(communication to corporate management of alleged defamation of corporation does not constitute "publication."); *Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir.1984)(intra-government dissemination of a defamatory statement, by itself, falls short of the notion of publication); *Six v. Henry*, 42 F.3d 582, 586 (10th Cir.1994) (stating that "even if ... [the defendant] had made a negative statement to other ... government office personnel as to any plaintiff," no publication occurred); *Lollis v. City of Eufaula*, 249 Fed.Appx. 20, 25 (10th Cir.2007) (unpublished) ("There is no evidence that the Defendants caused the ... statements or the reprimand to be published outside the Police Department or City Council, as is required to establish his claim.").

employment with prospective employers in the industry virtually impossible." Doc. 203, Second Am. Compl., , Am. Compl. ¶ 308. In this regard, Plaintiffs' latter statement further implies that Plaintiffs aren't even seeking such prospective opportunities. This is inadequate. "To sufficiently plead the first element of a claim for interference with contractual relations, a plaintiff cannot rest on conclusory allegations that it has existing or potential economic relations."[82] Instead, a plaintiff must "allege facts showing … a potential contract or business opportunity *with a third party or an identifiable class of third persons*."[83] Plaintiffs have not done that here. Accordingly, their claim should be dismissed.

### E. Plaintiff's Fifteenth Cause of Action for Intentional Infliction of Emotion Distress should also be dismissed.

In Utah, "[i]n order to state a claim for [IIED], a plaintiff must plead facts that demonstrate that the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.[84]

Here, as to Schmidt, Black, and Ulrich, Plaintiffs have not alleged conduct "toward" them as Plaintiffs were not part of Sharp's group chat. Furthermore, even if the statements were inaccurate, Plaintiffs cannot show any of the UMAC Defendants' conduct was for the *purpose* of inflicting emotional distress—as opposed to emotional distress simply being a byproduct of their

---

[82] *Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1556 (D. Utah 1996).
[83] *Id.* at 1556–57 (emphasis added).
[84] *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 58, 70 P.3d 17, 30.

conduct when it was later discovered by Plaintiffs.[85] Again, the purpose of these statements was to respond to an inquiry by their supervisor as to whether they knew who had authored the note/display. Plaintiffs describe the conduct using inflammatory language, but offer no support for their otherwise conclusory assertion that, "These Defendants acted intentionally to cause Plaintiffs' distress." Doc. 203, Second Am. Compl., 320. Conduct that is merely unkind or unfair does not rise to the level of outrageousness required to sustain a claim.[86]

Alternatively, the court should dismiss the Fifteenth Cause of Action as to Defendants White and Rosenberg because they are just a restatement of the same claims asserted against Utah Tech in the first, second and third causes of action under Title IX ("supportive measures" is a term that comes from Title IX). The Utah Supreme Court has cautioned against "opening the door to recovery" under this tort.[87] Because the conduct is already properly analyzed under Title IX, this court should decline to extend recovery to these circumstances.

V.   **PLAINTIFFS' SIXTEENTH, EIGHTEENTH, AND TWENTIETH CAUSES OF ACTION CANNOT ESTABLISH A VIOLATION OF 42 U.S.C. § 1983 BECAUSE UTAH TECH IS NOT A PERSON.**

Plaintiffs' Sixteenth and Eighteenth Causes of Action assert a § 1983 claim against Utah Tech. Looking at the clear, unambiguous, language of 42 U.S.C. § 1983 itself, only "persons," as that term has been defined by the courts, are subject to suit under § 1983.[88] However, Utah Tech

---

[85] *Franco v. The Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 27, 21 P.3d 198, 206, *abrogated on other grounds by Williams v. Kingdom Hall of Jehovah's Witnesses*, 2021 UT 18, ¶ 27, 491 P.3d 852.

[86] *Franco v. The Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 28, 21 P.3d 198, 207, *abrogated by Williams v. Kingdom Hall of Jehovah's Witnesses*, 2021 UT 18, ¶ 28, 491 P.3d 852.

[87] *Id.*

[88] *Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989)*; *also accord Ambus v. Utah State Bd. of Educ.*, 858 P.2d 1372, 1376 (Utah 1993) ("To be sued under § 1983, an entity must be a

is not a "person" within the meaning of § 1983.[89] This is because state agencies and/or arms of the state are not considered to be a "person" under § 1983.[90] Because Utah Tech, like its sister State Universities, is an arm of the State of Utah it cannot be considered to be a "person" under § 1983 and, therefore, Utah Tech is not subject to suit under the same.[91] Therefore, Defendant Utah Tech should be dismissed from Plaintiffs' Sixteenth Eighteenth, and Twentieth Causes of action pursuant to Rule 12(b)(6).

**VI.   PLAINTIFFS' SIXTEENTH, EIGHTEENTH, AND TWENTIETH CAUSES OF ACTION CANNOT ESTABLISH A VIOLATION OF 42 U.S.C. § 1983 BECAUSE THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

The individual defendants are entitled to qualified immunity from Plaintiff's claims. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate a clearly established statutory or constitutional right of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citation omitted). Qualified immunity is not merely a defense to liability; it is "an immunity from suit" "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

As an initial matter, a party asserting a constitutional violation against an individual government actor must meet a minimum threshold pleading requirement.  The Tenth Circuit

---

person, as that term has been judicially defined."); and *Dodge v. Shoemaker*, 695 F. Supp. 2d 1127, 1134 (D. Colo. 2010) ("States, state officials sued in their official capacities, and governmental entities that are considered "arms of the state" are not "persons" within the meaning of 42 U.S.C. § 1983").

[89] *See Will*, 491 U.S. at 68-71; *Harris v. Champion*, 51 F.3d 901, 905-06 (10th Cir. 1995).

[90] *Will*, 491 U.S. at 68-71.

[91] *Accord Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 575 (10th Cir. 1996)).

explains, "In the context of a § 1983 action against multiple individual governmental actors, it is particularly important ... that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her."[92]

The same particularized approach applies with full force when a plaintiff proceeds under a theory of supervisory liability. Various officials often have "different powers and duties." A plaintiff must therefore identify the specific policies over which particular defendants possessed responsibility and that led to the alleged constitutional violation.[93]

Here, Plaintiffs include broad allegations regarding "Defendants" generally, without identifying "the specific policies over which particular defendants possessed responsibility".

When a defendant asserts qualified immunity, the plaintiff bears a "heavy burden" under a two-part analysis. *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010). Plaintiff must show: (1) the defendant "violated … a constitutional right"; and (2) "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). This Court has discretion to decide which of the two-part analysis should be addressed first. *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (explaining courts are not required to address the prongs of the qualified immunity test in any particular order). "If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity." *Albright v. Rodriquez*, 51 F.3d 1531, 1535 (10th Cir. 1995).

---

[92] Truman v. Orem City, 1 F.4th 1227, 1235 (10th Cir. 2021) (internal citations and quotations omitted)

[93] Pahls v. Thomas, 718 F.3d 1210, 1226 (10th Cir. 2013) (internal citations omitted).

"The 'clearly established' inquiry examines whether the contours of the constitutional right were so well-settled, in the particular circumstances presented, that 'every reasonable [state] official would have understood that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658 (2012). Thus, to establish that a constitutional right is clearly established, a plaintiff must ordinarily make reference to "cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Riggins v. Goodman*, 572 F.3d 1101, 1111 (10th Cir. 2009) (citation omitted). Plaintiffs need not identify "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 131 S.Ct. at 2083. And, the Supreme Court has instructed federal courts "'not to define clearly established law at a high level of generality.'" *Mullenix*, 136 S.Ct. at 308. "The dispositive question is whether the violative nature of particular conduct is clearly established," which "inquiry must be undertaken in light of the specific context of the case, not as a general proposition." *Id.* (internal quotations and citation omitted).

The Tenth Circuit has explained how these principles work together in evaluating a 1983 claim:

> In sum, building on our earlier discussion: To make out viable § 1983 and *Bivens* claims *and* to overcome defendants' assertions of qualified immunity, plaintiffs here must establish that each defendant—whether by direct participation or by virtue of a policy over which he possessed supervisory responsibility—caused a violation of plaintiffs' clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind. Plaintiffs must do more than show that their rights "were violated" or that "defendants," as a collective and undifferentiated whole, were responsible for those violations. They must identify specific actions taken by particular defendants, or specific policies over which particular defendants possessed supervisory responsibility, that violated their clearly established constitutional rights. Failure to make this showing both dooms plaintiffs' § 1983 and *Bivens* claims and entitles defendants

45

to qualified immunity.[94]

Here, Plaintiffs' 1983 claims fail as they have alleged their due process claims against "Defendants" as a "collective and undifferentiated whole".  Plaintiffs fail to identify who is responsible for what—an omission made even more glaring by the claims that Plaintiffs are or were responsible for Title IX enforcement and compliance and should recognize the investigation and handling of their complaints complied with University policy.

### A. Plaintiff's Sixteenth Cause of Action for Deprivation of Property Without Due Process Fails to State a Claim.

To state a claim for deprivation of due process under the United States constitution, a plaintiff must allege they have a constitutional right that cannot be deprived absent adequate process.  Once a plaintiff has identified the right at issue, they must identify how the process given to them was inadequate by alleging an "affirmative link" between the official's conduct and the alleged constitutional deprivation.[95]  The affirmative link cannot be merely conclusory but must be alleged with specificity.[96]  A due process claim must set forth the contours of the right alleged which must arise from other sources of law.

Plaintiffs rest their due process claims on the broad, conclusory allegation that, "As employees of a public institution, Plaintiffs have a property interest in their employment and a reasonable expectation that their employment will continue and can only be subjected to adverse employment actions "for cause."  Doc. 203, Second Am. Compl, paragraph 325.  Plaintiffs do not allege precisely *what* right was allegedly deprived nor *who* allegedly took the challenged

---

[94] Pahls v. Thomas, 718 F.3d 1210, 1228 (10th Cir. 2013) (internal citations omitted)

action.  To the contrary, Plaintiffs make broad, conclusory assertions such as, "According to university policies", Plaintiffs should have been afforded due process rights…"[97]  However, Plaintiffs do not identify the policies on which they base their claims, let alone what those policies said or how the alleged actions violated those policies.  Further, they describe Defendants' Title IX investigation efforts as a "sham" and "biased and unrecognizable" without articulating precisely what aspects of the investigation were a sham or how the investigation should have proceeded so the court can evaluate whether the allegation is based on facts or merely conclusory.[98]  Notably, Plaintiffs include very few allegations relating to the actual investigation process followed by the University here, describing the months-long process in a mere four paragraphs from 161-164, without describing the investigations or hearings that they participated in as a part of this process.   This is fatal to their claim and applying the Tenth Circuit's pleading standards, Plaintiff's due process claims are subject to dismissal.

1. **Broadbent does not have a property interest in her continued employment.**

A due process claim must rest on some protected property interest.  At will employment does not create a property interest and Utah law states a university president's cabinet may include "a general counsel" who is "an at-will employee".[99]  As general counsel for Utah Tech, Ms. Broadbent was, by this statute, an at-will employee and not entitled to a property interest in her continued employment. Neither has Broadbent identified any basis for her claim that she has a property interest in her employment. Accordingly, all of Broadbent's due process claims must be dismissed.

---

[97] Doc. 203 Second Am. Compl., 326
[98] Doc. 203 Second Am. Compl., 162.
[99] Utah Code § 53H-3-303(3)(a)(i)(A).

**2.  Plaintiffs do not have a property interest in a specific investigatory process.**

Plaintiff's allegations regarding the denial of rights arising from the investigations into and handling of their complaints conflates statutory and contractual entitlements with constitutional due process protections. The Federal Due Process Clause does not constitutionalize every procedural requirement imposed by state law, institutional policy, or contractual agreement. Rather, the constitutional inquiry focuses on whether Plaintiff received the process that is constitutionally required, not whether the University strictly complied with every procedural mechanism established by statute or internal policy.

Even assuming, for purposes of argument, that Utah law or University policy contemplated a specific process as outlined in the Second Amended Complaint, an alleged failure to adhere to those procedures does not, standing alone, establish a federal constitutional violation. It is well settled that "process is not an end in itself." The Due Process Clause protects against the deprivation of a protected property or liberty interest without constitutionally adequate procedures; it does not guarantee that a governmental entity will faithfully follow all procedures prescribed by state law or internal regulations. Stated another way, the constitutional minimum is a federal question, not one answered by reference to the procedures a state chooses to prescribe. As the Tenth Circuit articulated in *Hulen v. Yates*, 322 F.3d 1229 (2003), quoting *Loudermill* directly, courts deciding whether a state has violated a person's constitutional right to procedural due process "should pay no attention to whether the state has complied with procedures mandated by state law"; "once the property right is established, it is purely a matter of federal constitutional law whether the procedure afforded was adequate." *Hulen v. Yates*, 322

48

F.3d 1229 (2003). Multiple Tenth Circuit decisions have recognized and applied this principle.[100]

Accordingly, a plaintiff cannot transform an alleged violation of a statute, policy, handbook provision, or contractual undertaking into a constitutional claim merely by characterizing the alleged noncompliance as a denial of due process.  Plaintiffs' claim is essentially they "should have been afforded due process rights and were entitled to fair, neutral and adequate grievance processes to determine whether the adverse employment actions they have experienced are valid."[101] However, as Plaintiffs do not have a constitutional right to a specific process, the claims relating to the investigation must be dismissed.

> **3. Plaintiffs have not stated a procedural due process claim with respect to the terminations, if any**.

Respecting Plaintiff's straight procedural due process claims as set forth in the Sixteenth cause of action, Broadbent does not have a property interest in her employment as described

---

[100] See *Guttman v. Khalsa*, 669 F.3d 1101, 1115 (2012); *Rector v. City and County of Denver*, 348 F.3d 935 (2003) ("It is well established, however, that a state's violation of its own laws does not create a claim under § 1983."); *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 522 (10th Cir. 1998) ("a university's failure to follow its established guidelines in overseeing a grievance 'does not in and of itself implicate constitutional due process concerns.' "); *Norton v. Village of Corrales*, 103 F.3d 928, 930 (10th Cir. 1996) ("[T]he result of error in the administration of state law, though injury may result, is not a matter of federal judicial cognizance under the due process clause of the fourteenth amendment."); *Onyx Properties LLC v. Board of County Commissioners of Elbert County*, 838 F.3d 1039, 1044 (2016); *Riggins v. Goodman*, 572 F.3d 1101, 1107, n.3 (2009)(holding that any allegation that the defendants failed to precisely follow city procedures was immaterial because the challenged termination comported with constitutionally minimal due process; *Monahan v. University of Utah*, Not Reported in Fed. Supp. (2005)(applying principal that "violation of internal procedures does not necessarily constitute a deprivation of a person's federal due process rights."); Coleman v. Utah State Charter School Board, 673 Fed.Appx. 822 (2016); *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998) (police officer alleged procedural due process violation when demotion in rank did not comply with the procedures guaranteed by his collective bargaining agreement; court held "the Constitution does not require that each individual receive the procedural guarantees provided for by the instrument which bestows a property interest.")
[101] Doc. 203, Second Am. Compl., 326.

above; Sainsbury has not been terminated, and Rasband has failed to address or even describe the process he was given through his termination as outlined in the termination letter and in the Second Am. Complaint at 172.  None of the actions complained of in the complaint except for termination of employment can sustain a due process claim as those actions have not resulted in any recognized deprivation of a property interest.

Rasband alludes to a post-termination hearing pursuant to University Policy 151, but does not describe whether that hearing was offered or took place.  Policy 151, attached hereto as Exhibit 4, provides for an extensive post-termination process, including an evidentiary hearing before a grievance committee that will include at least one member chosen by the employee requesting the hearing, present evidence, and whose decision will be in writing.  Critically, Rasband does not allege he was denied any of these protections and instead alleges he was offered the opportunity to grieve according to the policy.  Doc. 203, Second Am. Compl., 172. He does not include *any* facts regarding any process he received in the course of his termination—nor can he.  As such, Rasband cannot show he was denied any protected property interest *without* adequate due process as he was offered—and indeed participated in—a more than adequate process.[102]

### B. Plaintiffs' Eighteenth Cause of Action for Deprivation of Liberty Interest Fails to State a Claim.

Plaintiffs assert in their eighteenth cause of action deprivation of their liberty in violation of the due process protections of the United States constitution.  The elements of the claim are regarding a government employer: (1) it makes a statement that "impugn[s] the good name,

---

[102] This omission is made even more egregious given that Plaintiffs have amended their complaint twice since it was initially filed.

reputation, honor, or integrity of the employee"; (2) the statement is false; (3) the statement is made during the course of termination *and* "foreclose[s] other employment opportunities";[3] and (4) the statement is published, in other words disclosed publicly.[103]

Here, Plaintiffs have not identified any statement that was made in the course of their termination which could satisfy the first element and their claims must fail. Statements about performance issues do not qualify. The termination letters for Broadbent and Rasband identify the conflict and do not contain any statements that could be stigmatizing as required.

Even if they had identified a statement Sainsbury would still have no liberty interest claim as she has not been terminated. Although Broadbent and Rasband have been terminated, they have not alleged any publication of any statement that would communicate the basis of their termination. A letter to the employee does not qualify as publication. Finally, Plaintiffs do not allege any foreclosed employment opportunity. To state a claim, Plaintiffs must allege not only that there was a statement made in the course of their termination, but also that the statement has made them less attractive to employers. Having failed to state the necessary elements, Plaintiffs' claims for due process-liberty interest must be dismissed.

## C. Plaintiffs' Twentieth Cause of Action for Violation of the First Amendment Fails to State a Claim.

To state a free speech claim in the employment context, a plaintiff must satisfy the Tenth Circuit's free speech test. The test comprises five elements: (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the

---

[103] *McDonald v. Wise, 769 F.3d 1202, 1212 (10th Cir. 2014)*

public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. The first three elements are typically questions of law to be resolved by the court, the last two are typically issues of fact to be decided by a jury.[104] If the court finds the employee was speaking pursuant to their official duties, it does not need to address the remaining factors.

Plaintiffs have alleged throughout the complaint that compliance with Title VII, Title IX, and OEO are all specifically within the scope of their job duties.[105] Specifically, Plaintiffs have alleged as follows:

- "Plaintiffs, in their respective capacities within Utah Tech's offices of general counsel and Title IX…Plaintiffs have lost all support in their roles as Title IX and equity compliance officials."[106]

- Ms. Broadbent…was employed by Utah Tech as General Counsel…In this role, she managed and led the Office of General Counsel ("OGC"), with additional supervisory oversight over the Office of Equity and Compliance & Title IX…"[107]

- "Mr. Rasband…was employed by Utah Tech…as Senior Associate General Counsel. In his role, Mr. Rasband was the OGC attorney primarily responsible for advising the OEC and TIX."[108]

---

[104] *Davis v. Utah, No. 20-4042, 2021 WL 3930277, at *3 (10th Cir. Sept. 2, 2021)*.
[105] Doc. 203, Second Am. Compl., 1.
[106] Doc. 203, Second Am. Compl., 1
[107] Doc. 203, Second Am. Compl., 2
[108] Doc. 203 Second Am. Compl., 3

- "Ms. Sainsbury is [Utah Tech's] director of Equity Compliance and Title IX Coordinator, leading and managing OEC & TIX".[109]

- "Plaintiffs worked hard to establish a discrimination-free environment at Utah Tech. Yet, Plaintiffs received strong pushback, intimidation, discrimination, harassment, abuse, and retaliation in their ongoing attempts to educate Utah Tech leadership about, and to achieve compliance with, University policies regarding discrimination and harassment, including Title IX and Title VII."[110]

- "Defendants also resisted Plaintiffs' efforts to train Utah Tech's leaders on Title VII and Title IX compliance."[111]

- "Utah Tech's highest leaders continuously and openly undermined the OEC & TIX's and OGC's efforts to administer and ensure the protections of Title VII and Title IX and Equity Compliance for students and employees at Utah Tech."[112]

- "White recognized the gravity of including Plaintiffs' names on the note given they were both female administrators with responsibilities for ensuring the University's Title IX compliance."[113]

- "In response to Plaintiffs' protected activities of responding to Title IX incidents and complaints, enforcing compliance with Title IX, and advising and providing oversight over the University Title IX processes"[114]

---

[109] Doc. 203 Second Am. Compl., 4
[110] Doc. 203 Second Am. Compl., 32
[111] Id., 67
[112] Id., 68
[113] Id., 85
[114] Id. 197, 198, 199

- "when he [Lacourse] actively worked against Plaintiffs' compliance efforts"[115]

These numerous allegations make clear Plaintiffs have alleged that Title IX compliance was specifically within the scope of their job duties.  Speech that is within the employee's job duties is not protected by the First Amendment[116] and here, Plaintiffs rest their claim specifically on, "namely systemic hostility towards and violations of Title VII and Title IX".  Doc. 203, Second Am. Compl., 366.  As their speech was part of their efforts to "achieve compliance with…Title IX and Title VII".  Doc 203, Second Am. Compl., 32, it is not entitled to protection under the First Amendment and Plaintiffs' free speech claims must be dismissed.

## VII.   PLAINTIFFS' SEVENTEENTH AND NINETEENTH CAUSES OF ACTION ARE BARRED BY SOVEREIGN IMMUNITY.

As will be demonstrated in further detail below, because Utah Tech is an arm of the State of Utah it retains sovereign immunity from claims brought under the Utah Constitution. Therefore, this Court lacks jurisdiction over Plaintiffs' Seventeenth and Nineteenth causes of action and, as such, the same should be dismissed pursuant to Rule 12(b)(1).

### A.  As An Arm of the State of Utah, Utah Tech Retains Sovereign Immunity from Claims Arising Under the State Constitution.

The theory of sovereign immunity may be traced back to the historic English common law maxim "Rex non potest peccare," ("the King can do no wrong").[117] There were two distinct

---

[115] *Id.* 296.g

[116] *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1133 (10th Cir. 2024) ("Our precedents "have taken a broad view of the meaning of speech that is 'pursuant' to an employee's 'official duties.'") (internal citations omitted).

[117] *Zachery Davey, et al., Plaintiffs, v. Devin Blood, et al., Defendants. Additional Party Names: Est. of Ted Claude Davey, State of Utah, Ted Claude Davey*, No. 2:23-CV-442-AMA, 2024 WL 3728072, at *3 (D. Utah Aug. 7, 2024) (citing 1 William Blackstone, Commentaries on the Laws of England at *235, *238 (1765) (noting that no "action can be brought against the king, even, in

aspects to this doctrine of sovereign immunity: (i) that the King, as the font of law, is not bound by the law's provisions; and (ii) that the King, as the font of justice, is not subject to suit in its own courts.[118] This Court has previously recognized that "the common-law doctrines of sovereign immunity and local governmental immunity found their way into American jurisprudence" and "were recognized by the individual states of the United States from the outset" so that "nearly every state adopted the doctrine of immunity of the state for the torts of its officers."[119] Furthermore, while "statutes came to affect its importance in the succeeding centuries, the doctrine was never reduced to codification, and Americans took their understanding of [the sovereign] immunity doctrine from Blackstone" and it remained a common-law rule.[120] Additionally, the Supreme Court of Utah has observed that "sovereign immunity was a settled feature of the common law when Utah became a state [on January 4, 1896] and adopted its constitution."[121] In fact, the Supreme Court of Utah stated more than a century ago that "[i]n the absence of either express constitutional or statutory authority an action

---

civil matters, because no court can have jurisdiction over him" and that "it is at the same time a maxim in those laws that the king himself can do no wrong"); and 3 Blackstone, Commentaries at *254 ("That the king can do no wrong, is a necessary and fundamental principle of the English constitution ...")).

[118] *Id.* (citing Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 HARV. L. REV. 1, 3–4 (1963); see also 57 Am.Jur.2d Municipal, County, School and State Tort Liability § 10 (2001) ("Sovereign immunity presents a complete bar to suits against the state and it embraces two distinct principles: immunity from liability and immunity from suit.")).

[119] *MacArthur v. San Juan County*, 405 F. Supp. 2d 1302, 1317 (D. Utah 2005) (alterations to original).

[120] *Davey* at *3 (quoting *MacArthur*, 405 F. Supp. 2d 1317 (internal quotation marks omitted); and citing *Employees of Dept. of Public Health and Welfare of Missouri v. Department of Public Health and Welfare of Missouri*, 411 U.S. 279, 288 (1973) (Marshall, J., concurring in result) ("Sovereign immunity is a common-law doctrine that long predates our Constitution and the Eleventh Amendment, although it has, of course, been carried forward in our jurisprudence.")).

[121] *MacArthur*, 405 F. Supp. 2d at 1318 (alterations to original).

against a sovereign state cannot be maintained ... [this] doctrine is elementary and of universal application ..."[122] This maxim has been universally maintained by the Courts of the State of Utah over the years.[123] Furthermore, the Utah Supreme Court has more recently held that, when it comes to sovereign immunity, "[i]n the absence of applicable constitutional or statutory authority, Utah courts employ the common law."[124] As established above, the University of Utah is considered an arm of the State of Utah[125] and, as such, is entitled to the same sovereign immunity defenses enjoyed by the State. Additionally, when it enacted the Utah Governmental Immunity Act ("UGIA") in 1965 the Utah State Legislature, "barred all causes of action against the state and its political subdivisions unless expressly authorized by statute."[126] However, "there is nothing in the 1965 enactment or in any subsequent revisions that has abrogated the State of Utah's common law sovereign immunity from claims that the State is liable for violating provisions of the Utah Constitution"[127] and no court that the University is aware of has held to the contrary.

---

[122] *Davey* at \*4 (quoting *Wilkinson v. State*, 134 P. 626, 630 (Utah 1913) (internal quotation marks omitted)).

[123] *Id*. (citing *Campbell Bldg. Co. v. State Road Comm'n*, 70 P.2d 857, 861 (Utah 1937) ("[A]ction may not be maintained unless the state has, through legislative or constitutional action, given consent to be sued.") (citation omitted); *Tiede v. State*, 915 P.2d 500, 504 (Utah 1996) (recognizing that sovereign immunity—the principle that the state cannot be sued in its own courts without its consent—was a settled feature of American common law at the time Utah became a state) (citing *Wilkinson* and other cases)).

[124] *Id*. (citing *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder County Sch. Dist.*, 2000 UT 87, ¶ 20 & n.8, 16 P.3d 533, 537 & n.8 (Utah 2000) (citing Utah Code § 68-3-1 (1996) (providing that "[t]he common law of England so far as it was not repugnant to, or in conflict with, the constitution or laws of the United States, or the constitution or laws of this state … is hereby adopted and shall be the rule of decision in all courts of this state"))).

[125] *Watson*, 75 F.3d at 575.

[126] *Tindley v. Salt Lake City School Dist.*, 2005 UT 30, ¶ 9, 116 P.3d 295, 298 (Utah 2005)).

[127] *Davey* at \*4

In fact, the closest that any court has come to ruling that the State of Utah's sovereign immunity did not apply was the case of *Colman v. Utah State Land Board*, 795 P.2d 622 (Utah 1990). In *Colman*, the Utah Supreme Court held that a Takings Clause claim under Article I, Section 22 of the Utah Constitution could proceed against the State.[128] In making this determination, the Utah Supreme Court noted that Article I, Section 22, provided that "[p]rivate property shall not be taken or damaged for public use without just compensation," and that the Court had long ago determined that the State "cannot take or damage private property for public use without making just and adequate compensation … [t]his is the fundamental law of the commonwealth …[and] it is the duty of the courts to give it full force and effect whenever it is properly invoked … even against the sovereign power of the state."[129] The Utah Supreme Court went on to state that "[t]he framers [of the Utah Constitution] certainly did not intend to allow state government to override the constitutional guarantee with a legislative enactment," and that the State's obligation to pay just compensation was "mandatory and obligatory," and therefore held that the State itself was not immune from a claim under the Takings Clause.[130] The Court also held that the Takings Clause needed no legislation to activate it—i.e., it was self-executing.[131]

However, in *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder County Sch. Dist.*, 2000 UT 87, 16 P.3d 533, 535 (Utah 2000), which was decided a decade after *Colman*, the Utah

---

[128] *Colman*. at 634–35.
[129] *Id*. at 625, 631 (quoting *Croft v. Millard County Drainage Dist. No. 1*, 202 P. 539, 541 (Utah 1921)).
[130] *Id*. at 630, 635; *also see Davey* at *4.
[131] *Id*. at 632–634.

Supreme Court specifically held that Article I, Section 7, of the Utah Constitution was also self-executing and, within this context, went on to define the limitations of the Court's holding in *Colman*. In analyzing an action concerning claims against a local government agency asserting violations of the Due Process Clause of the Utah Constitution, the court observed that "[e]xcept for the Takings Clause, the Utah Constitution does not expressly provide damage remedies for constitutional violations" and, as such, "aside from the Takings Clause, there is no textual constitutional right to damages for one who suffers a [state] constitutional tort."[132] The Court in *Spackman* further observed that "there is no express statutory right to damages for one who suffers a constitutional tort" other than for a Takings Claim and because Utah still employs the common law, the court held that the ability for a person to recover damages against the State of Utah for a self-executing constitutional clause "rests on the common law."[133]

Having determined that that the Due Process Clause of the Utah Constitution was self-effecting,[134] the Spackman court set out a three-part test for determining when, under the prevailing common-law, a plaintiff may proceed against a government official and/or employee with a suit for damages for a violation of a self-executing provision of Utah's Constitution.[135] Moving forward "the Utah Supreme Court has continued to recognize Spackman's holding."[136]

---

[132] *Spackman.* at ¶20, 16 P.3d at 538.
[133] *Id.* at ¶20 & n.7, 16 P.3d at 537-38 & n.7.
[134] *See id.* at ¶18, 16 P.3d at 537.
[135] *Id.* at ¶¶19–25, 16 P.3d at 537-39.
[136] *Davey* at *5 (citing *Dexter v. Bosko*, 2008 UT 29 ¶22, 184 P.3d 592, 597–98 (Utah 2008); *Jensen ex. rel. Jensen v. Cunningham*, 2011 UT 17 ¶ 48, 250 P.3d 465, 478 (Utah 2011); and *Kuchcinski v. Box Elder County*, 2019 UT 21 ¶¶16, 31, 450 P.3d 1056, 1062, 1067 (Utah 2019) (all acknowledging the *Spackman* tests for money damages for state constitutional violations by government employees and officials)).

However, unlike the cases cited immediately above, which all deal with claims for money damages for state constitutional violations by government employees and/or officials, this Court has specifically addressed and analyzed these same types of claims when brought against the State of Utah. First, in *P.J. ex rel. Jensen v. State of Utah*, No. 2:05-cv-0739, 2006 WL 1702585, at *2 (D. Utah June 16, 2006), this Court concluded that ***common law sovereign immunity barred any state constitutional claims against the State of Utah, including claims brought under Article 1, Section 7***.[137] Relying on Spackman, the court dismissed the plaintiffs' claims in *Jensen* noting that "except for one provision not applicable here [the Takings Clause], the Utah Constitution does not expressly provide damages remedies for constitutional violations."[138] The court further observed that "'a Utah court's ability to award damages for [a] violation of a self-executing constitutional provision rests on the common law.'"[139] Notably, the court dismissed these claims despite expressly acknowledging that Article I, Section 7 (due process), was held to be self-executing by the Utah Supreme Court and also denied Plaintiffs' motion to certify the question of sovereign immunity to the Utah Supreme Court.[140]

More recently, in *Zachery Davey, et al., Plaintiffs, v. Devin Blood, et al., Defendants*, this Court held that "while actions for money damages against municipalities and individual state employees and officers for their violations of Utah's Constitution may sometimes be permissible, ***the State of Utah has not waived and still retains its sovereign immunity for almost all state constitutional violations***" and, therefore, the doctrine of sovereign immunity shielded the State

---

[137] *See Davey* at *5.
[138] *Jensen.* (alteration from original).
[139] *Id.* (quoting *Spackman,* 16 P.3d at 538).
[140] *Id.* at *14, 21.

of Utah from claims for monetary damages based on the State's own violation of its constitution, including claims brought under self-executing clauses such as Article I, Section 7.[141]

Based on the totality of the foregoing, Utah Tech maintains that, as an arm of the State of Utah, it enjoys sovereign immunity from Plaintiffs' Seventeenth and Nineteenth Causes of Action for violations of Article I, Section 7, of the Utah State Constitution. As such, this Court lacks jurisdiction to hear these causes of action and, therefore, the same should be dismissed pursuant to Rule 12(b)(1).

## VIII. PLAINTIFFS' TWENTY-FIRST CAUSE OF ACTION IS CONTRARY TO ESTABLISHED, CONTROLLING, PRECEDENT.

### A. Article I, Section 11, of the Utah Constitution Does Not Render the UGIA Unconstitutional.

As noted in Section III, supra, Defendants enjoy immunity under the UGIA from Plaintiffs' Tenth, Eleventh, Thirteenth, Fourteenth and Fifteenth Causes of Action. Indeed, Defendants argue that the inclusion of Plaintiffs' Twentieth Cause of Action, which asks this Court to declare the UGIA unconstitutional under Article I, Section 11, of the Utah Constitution (often referred to as the "Open Courts Clause") should be viewed as a tacit admission by Plaintiffs that such immunity not only exists but also serves to bar Plaintiffs' Tenth, Eleventh, Thirteenth, Fourteenth and Fifteenth Causes of Action from being brought against Defendants Utah Tech, White, Rosenberg, and the UMAC Defendants.

The Open Courts Clause states that "[a]ll courts shall be open, and every person, for an injury done to the person in his or her person, property, or reputation, shall have remedy by due

---

[141] *Davey* at *6.

course of law, which shall be administered without denial or unnecessary delay; and no person

shall be barred from prosecuting or defending before any tribunal in this State, with or without

counsel, any civil cause to which the person is a party."[142] In *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), the Utah Supreme Court adopted a three-part test to

determine whether a legislative act runs afoul of the Open Courts Clause.[143] Under this three-part

test a court first looks "to whether the legislature has abrogated a common law cause of

action."[144] Second, if it has abrogated a cause of action, a court must next "'determine whether

the law provides an injured person an effective and reasonable alternative remedy.'"[145] "Third,

'[i]f there is no substitute or alternative remedy provided,' a court should uphold the abrogation

of a cause of action against an open courts challenge 'only if there is a clear social or economic

evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or

unreasonable means for achieving the objective.'"[146]

The *Berry* test "has been the subject of considerable criticism since its adoption in

1985."[147] Some Utah Supreme Court Justices "have argued for its repudiation on the basis that it

violates separation of powers principles."[148] While other Justices of the Court "have challenged

---

[142] UTAH CONST. art. I, § 11.

[143] *Waite v. Utah Lab. Comm'n*, 2017 UT 86, ¶ 19, 416 P.3d 635.

[144] *Bingham v. Gourley*, 2024 UT 38, ¶ 16, 556 P.3d 53, 60 (citing *Waite*, 2017 UT 86 at ¶ 19).

[145] *Id.*

[146] *Id.*

[147] *Id.* at ¶ 17.

[148] *Id.* (citing *Judd v. Drezga*, 2004 UT 91, ¶ 11, 103 P.3d 135 (declining the Utah Attorney General's invitation "to disavow our *Berry* line of cases, and to recognize that by adopting the *Berry* approach we have assumed powers and duties not properly held by the court, but reserved for the legislature")).

its footing and argued for its replacement."[149] However, "[t]o date, the test's core elements have withstood these challenges."[150] But, despite its resilience, the Utah Supreme Court's application of the *Berry* test has evolved significantly since its inception. Notably, in *Judd*, the Utah Supreme Court "recognized 'an obligation of deference to legislative judgments in a *Berry* review, and to the extent this differ[ed] from our prior application of *Berry*,' we 'disavowed' those prior applications."[151] The Utah Supreme Court "emphasized this shift again in *Waite*, explaining that although pre-*Judd* open courts cases began with the presumption that the challenged statute was unconstitutional, that view 'is no longer good law.'"[152] As a consequence of this evolution, a Plaintiff wishing to bring an Open Courts Clause challenge "***accepts the burden of establishing that the three parts of the open courts test are in her favor***."[153] As such, ***it is the Plaintiffs' burden to affirmatively establish each of the three parts required under the Berry test***, beginning with establishing that whether the legislature has abrogated a common law cause of action.

### 1. Plaintiff has not established the abrogation of a common law cause of action.

To establish that a common law cause of action has been abrogated a Plaintiff must demonstrate that "the plaintiff could have brought his or her cause of action prior to 1987."[154]

---

[149] *Id.* (citing *Waite*, 2017 UT 86 at ¶ 36 (Lee, A.C.J., concurring in the judgment) ("*Berry* has outlived its usefulness. The time has come to overrule it."); *id.* ¶ 95 (Pearce, J., concurring) (collecting cases)).

[150] *Id.* at ¶ 18 (citing *Waite*, 2017 UT 86 at ¶¶ 31–34 (majority opinion) (stating it was not the appropriate case to reach the issue of whether the *Berry* test should be overturned); and *Judd,* 2004 UT 91 at ¶ 11).

[151] *Id.* at ¶ 19 (quoting *Judd*, 2004 UT 91 at ¶ 11).

[152] *Id.* (quoting *Waite*, 2017 UT 86, ¶¶ 21–22).

[153] *Id.* (emphasis added).

[154] *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 54, 356 P.3d 1172, 1186–8793.

This is because "1987 is the high-water mark of governmental liability in Utah, and any subsequent amendments to the Act expanding governmental immunity therefore eliminates causes of action that could have been maintained against governmental entities before 1987."[155] In fact, "[p]rior to the enactment of the Governmental Immunity Act in 1965, the common law doctrine of sovereign immunity prevented a citizen from suing a state governmental entity for any act considered to be a function of government."[156] Cases decided prior to the 1965 Governmental Immunity Act characterized a state action as "governmental" if it was not serving a "proprietary" function.[157] A "proprietary" function meant that, "in performing the action, the State obtained a pecuniary benefit, competed directly with private entities in the marketplace, or engaged in activity that could be successfully operated by private enterprise."[158] However, the 1965 Governmental Immunity Act "expanded liability for state entities beyond common law sovereign immunity by making the government subject to suit when it engaged in specific activities."[159] "It also provided that governmental entities retained blanket sovereign immunity protections when 'engaged in the exercise and discharge of a governmental function.'"[160] Additionally, because the 1965 Governmental Immunity Act did not define the term "governmental function," Utah courts continued to rely on the governmental-proprietary function test to interpret the full scope of immunity under the Act.[161]

---

[155] *Id.*
[156] *Id.* at ¶ 55.
[157] *Id.*
[158] *Id.*.
[159] *Id.* at ¶ 56.
[160] *Id.* (quoting UGIA, ch. 139, § 3, 1965 Utah Laws 390, 391).
[161] *Id.*

However, in *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230 (Utah 1980) the Utah Supreme Court expressly disavowed the governmental-proprietary function test finding that it led to "contrary and unpredictable results."[162] The *Standiford* Court then explained that "[t]he term 'government function' is a term of art in the law of sovereign immunity, meaning that a public entity is not liable for its torts committed in the exercise of a governmental function."[163] Building on this rationale, the Court held "that the test for determining governmental immunity" under the Act "is whether the activity under consideration is of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity."[164]

In response to the *Standiford* decision, in 1987 the Utah State Legislature further restricted governmental liability by expanding the Governmental Immunity Act's definition of "governmental function" to include "any act, failure to act, operation, function, or undertaking" regardless of whether the activity "is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons."[165] Since the passage of the 1987 amendments, the Utah State Legislature "has continued to expand the definition of 'governmental function' in subsequent amendments, and the statute currently defines that term as encompassing anything the government decides to

---

[162] *Id.* at 1235, 1236-37.
[163] *Id.* at 1235.
[164] *Id.* at 1236-37.
[165] *Scott*, 2015 UT 64 at ¶ 58 (citing *Richards Irrigation Co. v. Karren*, 880 P.2d 6, 9 (Utah Ct.App.1994) (quoting Utah Code § 63–30–2(4)(a) and (b) (1993), which includes the 1987 amendment to the UGIA).

64

do," specifically, "'each activity, undertaking, or operation performed by a department, agency, employee, agent, or officer of a government entity.'"[166] Therefore "[a]nytime the legislature expands the definition of 'governmental function,' it restricts the government's liability beyond the scope of the Act as interpreted in *Standiford*—possibly abrogating causes of action that would have existed before the 1987 amendment and violating the open courts clause."[167] Consequently, the Utah Supreme Court has "looked to the *Standiford* test—which defined 'governmental function' in the Act before the legislature expanded the definition of that term in 1987—to determine 'whether the Act in its current form abrogates a cause of action that existed prior to its enactment.'"[168]

In applying the *Standiford* test a court must assess "whether the activity giving rise to the cause of action [1] is of such a unique nature that it can only be performed by a governmental agency or ... [2] is essential to the core of governmental activity."[169] The first category "does not refer to what government *may* do, but to what government alone *must* do."[170] The second encompasses "those activities not unique in themselves (and thus not qualifying under the first part) but essential to the performance of those activities that are uniquely governmental."[171] For instance, the Utah Supreme Court has previously determined that governmental functions included transporting students to an out-of-state debate tournament, the regulation of boxing

---

[166] *Id.*

[167] *Id.* at ¶ 59.

[168] *Id.*

[169] *Id.* at ¶ 60.

[170] *Id.* at ¶ 61.

[171] *Id.*

matches, and operating a public transportation system.[172] In these cases, the Utah Supreme Court "identified the following factors as characteristics that weigh in favor of finding that an activity is a governmental function—the extent to which the activity is funded by the State, competes in the marketplace with private entities, generates annual profits, and would be "qualitatively different" if engaged in by a private entity."[173] Additionally, "[a]n activity that supports a core governmental function may satisfy the *Standiford* test even if it is not indispensable."[174]

For instance, in *Wright v. Univ. of Utah*, 876 P.2d 380 (Utah Ct. App. 1994) the Utah Court of Appeals held that the Plaintiff had "not been deprived of a remedy against the University because she could not recover under the law as it existed prior to the 1987 amendment."[175] The Court of Appeals began by noting that "[b]efore the 1987 amendment, the test for determining whether governmental immunity applied was 'whether the activity under consideration is of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity.'"[176] The Court of Appeals then went on to state that "[a]lthough no Utah cases directly address whether a public university meets the standard developed by *Standiford* in 1980, we note that historically, public school districts were held immune from tort liability."[177] The Court of Appeals then noted that "[m]oreover, the

---

[172] *Id.* (citing *Tindley*, 2005 UT 30, ¶¶ 25–26, 116 P.3d 295; *Moss v. Pete Suazo Utah Athletic Comm'n*, 2007 UT 99, ¶¶ 26–28, 175 P.3d 1042; and *Parks v. Utah Transit Auth.*, 2002 UT 55, ¶ 14, 53 P.3d 473).
[173] *Id*
[174] *Id.* at ¶ 64.
[175] *Id.* at 388.
[176] *Id.* (quoting *Standiford*, 605 P.2d at 1236–37).
[177] *Id.* (citing *Campbell v. Pack*, 15 Utah 2d 161, 389 P.2d 464, 465 (1964) (per curiam); *Bingham v. Board of Educ.*, 118 Utah 582, 223 P.2d 432, 434 (1950); and *Woodcock v. Board of Educ.*, 187 P. 181, 183 (Utah 1920)).

University performs a vital function in Utah, one not equaled by any private institution of higher education in the state" and specified that the "State of Utah appropriates substantial funds to the University, and the University in turn provides Utah students with an education that, while not free, is substantially discounted over the costs of a private institution" and "[t]hus, its University's activities can be classified as 'essential to the core of governmental activity' under the Standiford test."[178] The Court of Appeals concluded by holding that "the University's irreplaceable role in our community, coupled with the historical immunity granted public schools in Utah, qualifies its operation as a governmental function even under Standiford 's more stringent definition of that term" and, as such, "Wright has not been denied a remedy against the University under article I, section 11."[179]

Defendants maintain that, with the foregoing in mind, an application of the *Standiford* test to the present situation can lead to only one result, that application of the UGIA in its current form to Utah Tech and its employees does not abrogate a cause of action that existed prior to its enactment. This is because, like the University of Utah in the *Wright* case, the governmental function at issue in the present case is the operation of Utah Tech, a public university and a component unit of the State of Utah. Indeed, though originally operated by The Church of Jesus Christ of Latter-day Saints, the college was turned over to the State of Utah in 1933. It has risen from humble beginnings to experience unprecedented growth, transitioning to a four-year college in 2000 and securing University status in 2013. Utah Tech also receives 40.1% of its annual

---

[178] *Id.*
[179] *Id.*

67

funding directly from appropriations from the Utah Legislature, with the balance largely being provided by tuition.[180] Further, Utah Tech University has the lowest tuition among Utah's four-year universities, thus providing a more affordable option for the public to obtain a "University" education. In-state tuition and fees for the 2024-25 academic year are $6,074. Out-of-state tuition and fees are $17,644. With these facts in mind, Defendants maintain that it is impossible to argue that Utah Tech's operation is anything but an indispensable governmental function.

Because Utah Tech's operation as a public university qualifies as a "governmental function" under the *Standiford* test, Utah Tech has always enjoyed immunity, and is not liable for, any torts committed in the performance of any activity that it may have undertaken in the performance of its operations. Consequently, the immunity from suit provided to Utah Tech (and its employees) by the current form of the UGIA does not abrogate a common law cause of action that existed prior to its enactment, and is not unconstitutional under Article 1, Section 11, of the Utah Constitution.

### 2. The fact that Plaintiff has not, and cannot, establish an abrogation of an existing remedy precludes any analysis of the second and third parts of the *Berry* test.

Having established that the immunity from suit provided to Utah Tech (and its employees) by the current form of the UGIA does not abrogate a common law cause of action that existed prior to its enactment, and is therefore not unconstitutional under Article 1, Section 11, of the Utah Constitution, there is no need to proceed to the second and third parts of the *Berry* test which ask, respectively, (1) if the law provides an injured person an effective and

---

[180] *See 2024 Utah Tech Financial Statements,* https://employees.utahtech.edu/business-services/financial-statements/, at p. 16.

68

reasonable alternative remedy and, if this is the case, (2) if the abrogation was designed to address and eliminate a clear social or economic evil and if the elimination of an existing legal remedy was not an arbitrary or unreasonable means for achieving this objective. This is because when there is no abrogation of an existing right, these parts have no practical application since they cannot be applied to a nullity. This fact was recognized by the Utah Supreme Court in the *Tindley* case cited above. In *Tindley* the Utah Supreme Court held that "to determine whether the Act, or its 1987 amendment, 'abrogates a cause of action existing at the time of its enactment,' we must determine whether plaintiffs would have had a right to bring their cause of action … at any time prior to 1987" and "[i]f not, the Act does not abrogate an existing remedy, ***thereby terminating our analysis***" but "if, however, plaintiffs would have been able to bring suit against the District prior to 1987, we must then determine whether the Act's abrogation of that cause of action is permissible under *Berry*."[181]

Plaintiff has not, and cannot, establish that the immunity from suit provided to Utah Tech (and its employees) by the current form of the UGIA does not abrogate a common law cause of action that existed prior to its enactment. The analysis should terminate there since any attempt to analyze the second and third parts of the *Berry* test in the absence of a finding of abrogation would be futile, if not impossible.

## CONCLUSION

For all the foregoing reasons, Plaintiff's First, Tenth, Eleventh, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth and Twentieth Causes of Action

---

[181] *Tindley,* 2005 UT 30, ¶ 21, 116 P.3d 295, 301 (internal citations omitted) (emphasis added).

should be dismissed, thereby also requiring the dismissal of Individual Defendants Courtney White, Travis Rosenberg, Matt Black, Jyl Hall, Jared Madsen, Stacy Schmidt, and Brooke Ulrich since they are not named as defendants on any of the remaining claims.

DATED: June 19, 2026.

OFFICE OF THE UTAH
ATTORNEY GENERAL

*/s/ Daniel R. Widdison*
JAQUALIN FRIEND PETERSON
BRADLEY BLACKHAM
DANIEL R. WIDDISON
BRETT ANDRUS
Assistant Attorneys General
*Attorney for Defendants*